IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

KIRVAN COLE

CRIMINAL CASE NO.

1:09-CR-412-ODE-RGV

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation of the United States Magistrate
Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R.
58.1(A)(3)(a) and (b).  Let the same be filed and a copy, with a copy of this Order, be
served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any,
to the Report and Recommendation within fourteen (14) days of receipt of this
Order.  Should objections be filed, they shall specify with particularity the alleged
error(s) made (including reference by page number to the transcript if applicable)
and shall be served upon the opposing party.  The party filing objections will be
responsible for obtaining and filing the transcript of any evidentiary hearing for
review by the District Court.   If no objections are filed, the Report and
Recommendation may be adopted as the opinion and order of the District Court and

any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this 12th day of May, 2010.


*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

KIRVAN COLE

CRIMINAL CASE NO.

1:09-CR-412-ODE-RGV

**MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION ON DEFENDANT'S PRETRIAL MOTIONS**

Defendant Kirvan Cole ("Cole")[1] is charged in a one-count indictment with knowingly possessing four firearms after a felony conviction in violation of 18 U.S.C. § 922(g). [Doc. 1].[2] Cole has moved to suppress evidence and his statements, [Docs. 12 & 14], and following an evidentiary hearing on February 9, 2010,[3] the parties filed post-hearing briefs on the motions, [Docs. 22, 24, & 25]. For the following reasons,

---

[1] a/k/a Gary Barnes.  See [Doc. 1].

[2] The indictment also includes a forfeiture provision pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461.  [Doc. 1].

[3] See Doc. 21 for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the parties submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. __)" for the government's exhibits and "(Def. Ex. __") for Cole's exhibits.

it is **RECOMMENDED** that Cole's motions to suppress evidence and statements, [Docs. 12 & 14], be **DENIED**.

## I. STATEMENT OF FACTS

### A.    Road Block Stop, Arrest, and Search of Vehicle

On May 6, 2009, at approximately 2:00 a.m., seven Henry County Police Department ("HCPD") officers, acting under the supervision of Sergeant Jennifer Savage ("Sgt. Savage"), set up a roadblock checkpoint on the overpass at Eagles Landing Parkway at Interstate 75 in Stockbridge, Georgia, in order to conduct a sobriety check and license and registration examination. (Tr. at 4, 6-11, 14, 17, 21-22, 47; Gov. Exs. 1 & 2). HCPD officers identified the roadblock by marked police vehicles, the use of "blue lights," and uniformed police officers wearing reflective vests who directed traffic by the use of flashlights. (Tr. at 12; Gov. Ex. 2). The officers stopped all vehicles that approached the roadblock checkpoint, and the average stop lasted from thirty seconds to one minute unless the officers noticed something that required further investigation "such as somebody appearing to be under the influence of alcohol or something of that nature." (Tr. at 11, 20, 22). As a result of the May 6 roadblock, which lasted until approximately 4:00 a.m., HCPD officers made two or three arrests for driving under the influence and at least one arrest for driving on a suspended license. (Tr. at 12-15).

At approximately 3:00 a.m. on May 6, an individual later identified as defendant Cole approached the roadblock checkpoint driving a black, four-door BMW X5 Sport Utility Vehicle. (Tr. at 23-24, 48). HCPD Officer Wesley McNure ("Officer McNure") stopped Cole's vehicle, introduced himself, and asked for Cole's driver's license. (Tr. at 18, 23, 43). As Cole handed Officer McNure his driver's license, Officer McNure, who had shined his flashlight into the vehicle, observed "a small bag, a sandwich baggy" containing what appeared to be less than an ounce of marijuana and a loaded "handgun clip or magazine" in the center console area of Cole's vehicle. (Tr. at 23-24, 43, 45-46).[4] Officer McNure asked rhetorically, "What is that?" (Tr. at 25). Cole did not respond, but looked up at the ceiling of his vehicle, and Officer McNure then instructed Cole to hand him the bag, and Cole complied. (Tr. at 25, 50-51). Officer McNure asked Cole to pull his vehicle over to the side of the road, and Cole again complied. (Id.).

Officer McNure approached Cole's vehicle and asked Cole to exit and walk to the rear of his vehicle, which Cole did. (Tr. at 25-26, 50-51). Officer McNure then asked Cole "about the marijuana" and "if he cared to explain it." (Tr. at 26, 51). Cole responded that the marijuana was his and that it was just for recreational use

---

[4] Officer McNure testified that he has received training on drug identification and that he had even made an arrest earlier that night for possession of less than an ounce of marijuana. (Tr. at 22, 46-47).

and asked Officer McNure "just to let him slide on it."  (Tr. at 26).  Officer McNure then asked Cole about the ownership of the magazine clip he had observed and whether there were any weapons in the vehicle.  (Tr. at 26, 52).  Cole said that the magazine clip belonged to a friend of his that was in the vehicle earlier that night and that there were no weapons inside the vehicle.  (Tr. at 26).

At this time, Officer McNure advised Cole that he was placing him under arrest for possession of marijuana and asked him to turn around and place his hands behind his back.  (Tr. at 27, 47).  In response, Cole turned around, but as Officer McNure reached for Cole's left wrist in order to place him in handcuffs, Cole "snatched his wrist forward and bolted back towards the driver's seat."  (Tr. at 27-28).  As Cole was reaching into the driver's seat with his right arm, Officer McNure grabbed Cole's left arm and attempted to pull him out of the vehicle.  (Tr. at 28).  During the struggle, Officer McNure noticed that Cole's right hand was moving away from him and towards the middle console area.  (Id.).  Because of his concern that Cole was attempting to reach a firearm, Officer McNure "lunged into the vehicle, wrapped [his] right arm around [Cole's] head and tried to get better leverage to pull him back outside of the vehicle."  (Tr. at 29).  At this point, another HCPD officer came to assist Officer McNure and both officers and Cole fell out of the vehicle and onto the ground.  (Id.).  Cole continued to struggle with the officers,

4

but eventually he was placed in handcuffs, patted down, and then placed in the back seat of Officer McNure's patrol vehicle.  (Tr. at 29-30, 32).

After Cole was placed under arrest and secured in the patrol vehicle, Officer McNure and Lieutenant James Scott Gray ("Lt. Gray") searched Cole's vehicle.  (Tr. at 30, 37, 60-61).  As Officer McNure opened the doors to Cole's vehicle, he smelled what he believed to be the strong odor of raw marijuana coming from the vehicle. (Tr. at 30).  The officers searched the entire passenger compartment of Cole's vehicle and recovered a small, two-round gun in the center console area of the front seat, a Keltec pistol from the back seat behind the driver's seat, $54,286.61 in cash in a shoe box located in a shopping bag on the floorboard behind the driver's seat, two handguns that were also in a shopping bag on the floorboard behind the driver's seat, and various cellular telephones.  (Tr. at 31, 35-36, 49-50, 52-53, 57, 59-60; Gov. Exs. 3, 4, & 5).  The officers seized these items and placed them in the trunk of an officer's patrol vehicle while Officer McNure maintained custody of the bag of marijuana initially located in the center console.  (Tr. at 31).  After the search was concluded, the officers impounded Cole's vehicle pursuant to HCPD policy and it was towed by a private company.  (Tr. at 37, 59, 61; Gov. Exs. 6 & 7).  Cole was then transported to the HCPD and placed in an interview room.  (Tr. at 38, 64).[5]

---

[5] At some point after the officers returned to the HCPD, they took the money seized from Cole's vehicle and placed it in three brown paper bags, which were then

5

At approximately 6:30 a.m. on May 6, HCPD Drug Enforcement Administration Task Force Special Agent Jason Allen ("Agent Allen"), arrived at the HCPD to interview Cole in order to determine whether the "large money seizure" could be adopted federally.  (Tr. at 63-64).  Agent Allen entered the interview room, introduced himself to Cole, and in the presence of another officer, advised Cole of his <u>Miranda</u>[6] rights by reading these rights from a DEA-13A Form.  (Tr. at 64-66; Gov. Exs. 8, 9, & 10).  Specifically, Agent Allen advised Cole that he had the right to remain silent and that any statements he made could be used against him in court. (Tr. at 65; Gov. Ex. 8).  Agent Allen further advised Cole that he had the right to speak to an attorney, to have one present during the questioning, and to have one appointed for him if he could not afford one.  (<u>Id.</u>).  After he read Cole his <u>Miranda</u> rights, Agent Allen asked Cole if he would answer some questions, and Cole provided an affirmative response.  (Tr. at 66-68).

During the interview, which lasted approximately 10 to 15 minutes, Agent Allen asked Cole about the large amount of currency that was seized from his vehicle.  (Tr. at 67).  In response, Cole explained that he owned a music label

---

lined up alongside three empty brown paper bags.  (Tr. at 38-39).  A canine sniff of the packages was conducted, and Officer McNure observed the canine direct his attention to the paper bags containing the money.  (Tr. at 39-40).

[6] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

company called "Unit Entertainment" in Clayton County and that the money belonged to individual investors in the company. (Id.). After Agent Allen started asking more questions about Unit Entertainment, Cole indicated that he wanted to speak with his attorney. (Tr. at 67-68). Therefore, Agent Allen concluded the interview. (Tr. at 67).[7]

**B.**     **Arrest, Protective Sweep, and Search of Residence**

On September 22, 2009, a grand jury in the Northern District of Georgia returned the pending indictment against Cole based on the incident that occurred on May 6, 2009, [Doc. 1]; (Tr. at 86; Gov. Ex. 11), and an arrest warrant was issued for him on October 22, 2009, (Tr. at 72; Gov. Ex. 12). On October 23, 2009, Special Agent Joel Sheppard ("Agent Sheppard") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), who is assigned to the United States Marshal's Fugitive Task Force, began trying to locate and apprehend Cole. (Tr. at 71-73, 86). Sometime between October and the beginning of November, Agent Sheppard conducted a database search in an attempt to obtain information about Cole's residence and where he may be located and eventually discovered that Cole was connected to a residence at 1228 Ithaca Drive in McDonough, Georgia. (Tr. at 73, 86-

---

[7] At some point after Agent Allen arrived at the HCPD, he searched Cole's Motorola cellular telephone that was seized from his vehicle following his arrest. (Tr. at 35, 69). Specifically, Agent Allen searched the recent calls and contacts stored on the phone. (Tr. at 69-70).

87, 103).  Subsequently, Agent Sheppard also received information from a postal inspector that Cole and an individual named Keith Cole were receiving mail at the 1228 Ithaca Drive address.  (Tr. at 73, 88-89, 92).  During the course of his search for Cole, Agent Sheppard also discovered that Minita Tanner ("Tanner") was Cole's girlfriend, and he obtained a copy of her photograph and driver's license.  (Tr. at 92).

On December 16, 2009, Agent Sheppard initiated surveillance of the residence located at 1228 Ithaca Drive in McDonough.  (Tr. at 73; Gov. Ex. 14).[8]  Agent Sheppard arrived around noon and approximately one hour later observed a black BMW pull into the driveway of the residence.  (Tr. at 74, 76-77, 91).  Agent Sheppard identified the driver as Cole and observed Tanner, who exited the residence, and Cole converse in the driveway for two to three minutes.  (Tr. at 76-77).  After Tanner went back inside the residence, Agent Sheppard observed Cole pull his vehicle into the garage, park and exit the vehicle, and enter the residence.  (Tr. at 77).  Immediately thereafter, Tanner was observed leaving the residence in a white Mercedes.  (Tr. at 77, 91).  Agent Sheppard called for backup to assemble an arrest

---

[8] Approximately a week and a half prior to December 16, another agent surveilled the 1228 Ithaca Drive residence and observed the black BMW Cole was arrested in on May 6 leave the residence, but the agent could not identify the driver of the vehicle at that time.  (Tr. at 89-90).  Thereafter, a couple of days prior to December 16, Agent Sheppard conducted surveillance of the same residence, but "didn't see any activity at all."  (Tr. at 90-91).

team and was relieved by another agent who continued surveillance of the residence. (Tr. at 76-78).[9]

Agent Sheppard went to a staging area to prepare to execute the arrest warrant and briefed the other agents concerning Cole's physical size and criminal history, the nature of the charges against him, the type of vehicle he was driving, the fact that he had previously fought with police officers and may be associated with machine guns, and he showed the other agents Cole's photograph. (Tr. at 74-75, 78, 80, 108).[10] The arrest team then proceeded to the 1228 Ithaca Drive residence. (Tr. at 78, 95, 108-09). At least four agents were on the perimeter team that surrounded the residence. (Tr. at 96). Approximately eight to ten agents, who were on the entry team, approached the front door of the residence in a single-file line, commonly referred to as a "stack." (Tr. at 95-96).

---

[9] Agent Sheppard also contacted HCPD in order to have officers positioned near the residence to conduct a traffic stop should Cole leave the residence prior to execution of the arrest warrant. (Tr. at 78).

[10] Agent Sheppard had received information from Special Agent Daniel Arrugueta ("Agent Arrugueta") that Cole had a criminal history that involved firearms and assault rifles, that he had a 2000 conviction in New York for criminal possession of a weapon in the third degree, that after his May 6, 2009, arrest, four firearms were found in his vehicle, and that he had been suspected in a deal "to provide machine guns to a special agent," and Agent Sheppard relayed this information to his arrest team. (Tr. at 75, 78, 80, 93-95, 101-02, 104, 107-08; Gov. Ex. 13).

Agent Sheppard knocked on the front door and announced their presence, but no one answered.  (Tr. at 79, 109).  After this initial knock and announce, Agent Sheppard noticed someone peeking through the blinds from an upstairs window, but he could not identify whether the individual was male or female.  (Tr. at 79, 97, 109; Gov. Ex. 14).  Agent Sheppard knocked two more times and, after waiting 30 to 45 seconds, he and the other agents forcibly entered the residence by breaching the front door.  (Tr. at 79-80, 109).[11]  When the agents entered the residence, they first encountered Cole who was coming down the stairs.  (Tr. at 80, 97).  Cole continued to the bottom of the stairs and identified himself to the agents at which time they ordered him to get down on the ground, patted him down to make sure he did not have a weapon, handcuffed him, and placed him under arrest.  (Tr. at 80, 97, 137).  The agents then heard a female, later identified as Cotton, yelling from upstairs, "I'm on the ground" and "I'm up here."  (Tr. at 80, 136-37).  Cotton also advised the

_____

[11] Janae Cotton ("Cotton"), Tanner's 18-year-old cousin who was present inside the residence at the time the agents entered, testified that she was upstairs holding Cole and Tanner's 12-month-old baby when she heard what sounded like brakes of a car.  (Tr. at 94, 98, 130-31, 134, 144).  Cotton stated that she peered out of the upstairs window and observed 10 to 15 unmarked cars.  (Tr. at 134).  She testified that she then yelled to Cole, who was playing loud music on the computer, that there were cars in the front yard.  (Tr. at 134-35).  She stated that Cole went to the laundry room, put on sweatpants, and proceeded down the stairs.  (Tr. at 135).  Cotton testified that she did not hear any knocks until Cole was going downstairs and was halfway to the door.  (Id.).  Specifically, Cotton testified that she only heard two knocks immediately following each other and that within one second of the knocks, agents breached the door and entered the residence.  (Tr. at 135-36).

agents that there was a baby upstairs.  (Tr. at 80, 137).

The agents then fanned out in order to conduct a protective sweep of the residence.  (Tr. at 80, 82-83, 98).[12]  At this time, approximately five agents proceeded upstairs where they encountered Cotton, who was holding the baby, and they asked her to stand against the wall.  (Tr. at 99, 137, 148).  In the meantime, the agents continued their sweep of the upstairs, searching areas "where someone [could] hide."  (Tr. at 82).[13]  After the agents determined that the only people in the residence were Cole, Cotton, and the baby, the agents concluded the sweep, which lasted approximately two to four minutes.  (Tr. at 80, 98-99, 101).

During the protective sweep, agents observed a revolver and a semiautomatic pistol on a dresser or nightstand in an upstairs bedroom later determined to belong

---

[12] Agent Sheppard testified that, for officer safety reasons, "[w]hen we go into a house, we search for . . . the fugitive and anywhere in the outlying area where there might be anybody hidden or that can come out and hurt us."  (Tr. at 82).

[13] Agent Sheppard explained that "being there was a person upstairs which brought us to the upstairs level, then we searched that area for additional people as well."  (Tr. at 82).  Cotton testified, however, that during the search, she could hear the agents opening drawers, bathroom cabinets, and the closet door.  (Tr. at 138-39).  Cotton further testified that once she was brought downstairs, she observed agents "[g]oing through kitchen cabinets, opening baby formula, protein shakes and going just walking in and out the room downstairs."  (Tr. at 139-40).  However, Agent Arrugueta testified that "[t]here was a protective sweep done for people.  There was no search.  There was nothing opened, lifted, examined.  There was nothing else moved.  If a body couldn't hide in it, as far as I am aware nothing was moved, nothing was examined, nothing was searched."  (Tr. at 112).

to Cole.  (Tr. at 80, 83, 99-100, 109-10, 118, 124; Gov. Ex. 19).  The agents did not seize or take possession of the firearms at this time, but Agent Arrugueta did remove the ammunition from the firearms and then returned them to the same place they were found.  (Tr. at 85, 125).  Additionally, the agents saw a small amount of marijuana and a piece of plastic behind a small desk in the upstairs loft area and ammunition for a .32 caliber pistol in a plastic container on the kitchen counter.  (Tr. at 112, 121-22; Gov. Ex. 18; Def. Ex. 2).  Agents also observed a Georgia Natural Gas bill bearing Cole's name and a pistol holster in a plastic container on the floor of a closet.  (Tr. at 122-23).

Agents Arrugueta and Sheppard both advised Cole of his <u>Miranda</u> rights.  (Tr. at 83-85, 114-15).[14]  Cole acknowledged his rights, but he refused to talk, so no interview was conducted.  (Tr. at 85, 115).  However, Agent Arrugueta testified that, for officer safety purposes, he asked Cole if there was anything in the residence  that

_____

[14] Agent Arrugueta testified that after Cole was arrested and standing in the entry area, he advised Cole of his <u>Miranda</u> rights by reciting them from memory. (Tr. at 114-15).  Agent Sheppard testified that after completing the protective sweep, he read Cole his <u>Miranda</u> rights from a standard-issue <u>Miranda</u> card.  (Tr. at 83-84; Gov. Ex. 16).  Specifically, Agent Sheppard advised Cole that he had the right to remain silent and that any statements he made could be used against him in court. (Gov. Ex. 16).  He further advised Cole that he had the right to speak to an attorney, to have one present during the questioning, to have one appointed for him if he could not afford one, and, in the event he proceeded with questioning without an attorney, to stop answering questions at any time.  (<u>Id.</u>).

could hurt the agents, such as guns or bombs, and Cole replied that there were two

guns upstairs.[15]  (Tr. at 116).

After Cole was in custody, Agent Arrugueta prepared an affidavit and

application for a search warrant for 1228 Ithaca Drive, which ATF Special Agent

Allan Lamar McLeod, III ("Agent McLeod") signed and presented to United States

Magistrate Judge Gerrilyn G. Brill.  (Tr. at 111-12, 128; Gov. Ex. 17).  In the affidavit

in support of the application, Agent McLeod relayed, among other things, the facts

relating to Cole's May 6 arrest, the December 16 surveillance and entry of Cole's

residence, and the protective sweep of Cole's residence.  (Gov. Ex. 17).  Specifically,

Agent McLeod stated in relevant part:

> COLE was taken into custody near the front door, and agents proceeded
> to clear the residence to ensure there were no other threats present.  In
> an upstairs master bedroom, agents observed two (2) firearms. . . . Both
> firearms were lying on top of a nightstand with what appeared to be a
> man's wallet lying on top of them.
>
> . . .
>
> As agents cleared the house, they observed in plain view: the firearms
> detailed above, a Georgia Natural Gas bill addressed to Kirvan COLE,
> 1228 Ithaca Drive, McDonough, Georgia, a knotted, torn plastic baggy
> on an upstairs handrail (consistent with what is used to store small
> amounts of illegal drugs), another torn plastic baggy behind a computer
> table containing dried, green leafy material and seeds consistent with
> the appearance of marijuana, four rounds of .32 caliber ammunition in

---

[15] Agent Arrugueta did not specify when he asked Cole if there was anything
in the house that could hurt the agents, but according to the affidavit he reviewed
to refresh his memory, this exchange occurred while other agents were completing
the protective sweep.  (Tr. at 115-16; Gov. Ex. 17).

a plastic container that originally contained fifty (50) rounds, and a pistol holster in the floor of a closet in a child's bedroom.  Also in plain view was a computer which was running and apparently connected to the Internet.

[Id. ¶¶ 13, 17].  Judge Brill signed the search warrant, and the agents seized various items from Cole's residence pursuant to the warrant.

## II.  DISCUSSION

Cole moves to suppress evidence and statements obtained following the stop of his vehicle at the roadblock on May 6, 2009.  [Doc. 24 at 11].  Specifically, Cole argues that the roadblock checkpoint was illegal and therefore "all evidence derived from the illegal 'road block' should be suppressed from evidence at trial, which includes the evidence seized from the vehicle, the evidence seized from [his] residence, and any statements made by [him] to law enforcement on May 6, 2009 and December 16, 2009."  [Id. at 12].  Cole also challenges his detention, the questioning by law enforcement officers during his detention, and the subsequent search of his vehicle and seizure of evidence following his arrest.  [Id. at 12-16].[16]

Cole also argues that all the evidence recovered from his residence on December 16, 2009, should be suppressed because the initial entry and subsequent search were illegal, and therefore tainted the questioning of him by law enforcement

_____

[16] Cole further challenges the canine sniff of the packages at the HCPD, the continued questioning by Agent Allen at the HCPD, and the search of his cellular telephone.  [Doc. 24 at 16-24].

14

as well as the subsequent search warrant and search of the residence.  [Id. at 24-32].

Moreover, Cole contends that even if the initial entry and protective sweep were

lawful, his statements at the scene were obtained in violation of his Miranda rights

and are therefore due to be suppressed.  [Id. at 27-31].  The Court will address the

merits of each of these arguments.

A.      **The May 6, 2009, Stop and Arrest of Cole**

      1.      *The Roadblock Checkpoint*

"The Fourth Amendment requires that searches and seizures be reasonable,"

and "[a] search or seizure is ordinarily unreasonable in the absence of individualized

suspicion of wrongdoing."  United States v. Regan, 218 Fed. App. 902, 903 (11th Cir.

2007) (*per curiam*) (unpublished) (citing Chandler v. Miller, 520 U.S. 305, 308 (1997)).

The "[t]emporary detention of individuals during the stop of an automobile by the

police, even if for only a brief period and for a limited purpose, constitutes a 'seizure'

of persons within the meaning of this provision."  Whren v. United States, 517 U.S.

806, 809-10 (1996) (citations omitted); United States v. Purcell, 236 F.3d 1274, 1277

(11th Cir. 2001).  Thus, "[v]ehicle stops at roadway checkpoints constitute a seizure

within the meaning of the Fourth Amendment."  United States v. Smith, No.

2:09-cr-128-MEF, 2009 WL 5066811, at *9 (M.D. Ala. Dec. 16, 2009), adopted at *1

(citing City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000)).

"Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Regan, 218 Fed. App. at 903 (citation omitted). "[T]he Supreme Court has upheld brief, suspicionless seizures of motorists at a sobriety checkpoint aimed at removing drunk drivers from the road." Regan, 218 Fed. App. at 904 (citing Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 445 (1990)). "In addition, in Delaware v. Prouse, [440 U.S. 648, 663 (1979)], the Supreme Court suggested that a roadblock to question all oncoming traffic to verifying drivers' licenses and vehicle registrations with the interest of serving highway safety would be permissible under the Fourth Amendment." Id.  However, the Supreme Court "has held that a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing violates the Fourth Amendment." Id. (citing Edmond, 531 U.S. at 37-38).

"The Fourth Amendment test 'is reasonableness in light of all the circumstances.'" Smith, 2009 WL 5066811, at *9 (quoting United States v. Prevo, 435 F.3d 1343, 1345 (11th Cir. 2006)).  That is, "[e]ven if the government has the authority to conduct a checkpoint, the reasonableness inquiry under the Fourth Amendment requires a determination of whether the intrusion on an individual's privacy was warranted in light of the state's interest." Regan, 218 Fed. App. at 904 (citing Sitz, 496

16

U.S. at 453-54). <u>See also</u> <u>United States v. Brock</u>, No. 2:09 CR 226 PS, 2010 WL 417395, at *2 (N.D. Ind. Jan. 22, 2010).

The testimony from the suppression hearing shows that the HCPD police officers set up the May 6, 2009, roadblock checkpoint in order to conduct a sobriety check and license and registration examination. (Tr. at 4, 6-11, 14, 17, 21-22, 47). The HCPD police officers, acting under the supervision of Sgt. Savage, identified the roadblock checkpoint with marked police vehicles, the use of "blue lights," and uniformed police officers wearing reflective vests who directed traffic by the use of flashlights. (Tr. at 4, 6-12, 14, 17, 21-22, 47; Gov. Ex. 2). The average stop of the vehicles lasted from approximately thirty seconds to one minute, unless the officers noticed something that required further investigation. (Tr. at 11, 20, 22). As a result of the roadblock, the officers made two to three arrests for driving under the influence and at least one arrest for driving on a suspended license. (Tr. at 12-15). Thus, "the after arrest reports and suppression hearing testimony confirmed that the checkpoint was executed for the important state interest of ensuring compliance with the state's driver licensing and vehicle registration laws, and to check for drunk drivers," <u>Regan</u>, 218 Fed. App. at 905 (citations omitted), and was done so in a manner that caused minimal intrusion into an individual's privacy. In short, the government's interest in maintaining roadway safety and enforcing traffic laws,

17

including a license and registration check, the effectiveness of the checkpoint in achieving these goals, and the minimal level of intrusion on an individual's privacy caused by the checkpoint, all weigh in favor of finding that the checkpoint was reasonable. Id.

Cole argues that the roadblock checkpoint on May 6 was illegal because the officers failed to post signs indicating a roadblock checkpoint was ahead, thereby violating their own policy and procedure. [Doc. 24 at 11].[17] The portion of the HCPD policy Cole contends was violated states, "The roadblock or safety checkpoint must be well identified as a police checkpoint. (i.e. Signs, traffic cones, blue lights, flares)." (Gov. Ex. 1 at § 301.21 ¶ 7b(2)).   Contrary to Cole's contention, the HCPD policy only requires that the roadblock checkpoint be "well identified as a police checkpoint," not that specific indicators be used to signify a checkpoint.  (Id.).   Indeed, the use of parentheticals and "i.e." after that statement indicates that "[s]igns, traffic cones, blue

_____

[17]   Cole also argues that the roadblock was invalid because the officers failed to stop traffic in both directions. [Doc. 24 at 11]. Cole's argument, however, ignores the testimony from the suppression hearing that all vehicles were stopped. (Tr. at 20, 22). Indeed, Officer McNure testified that "a hundred percent of the vehicles" were stopped. (Id.). Therefore, "[t]he . . . testimonial evidence . . . showed that every motorist who drove through the intersection during the checkpoint was stopped. Thus, the officers did not engage in randomized stops; instead, every vehicle was stopped and every motorist was asked for documentation." Regan, 218 Fed. App. at 905 (citing Prouse, 440 U.S. at 661). Accordingly, Cole's argument in this regard is without merit.

lights, flares" were meant to be examples of how to identify a police roadblock checkpoint, but not an exclusive list.

This interpretation of the policy is further supported by the HCPD Roadblock & Safety Checkpoint Record, which provides a number of options, including marked police vehicles, blue lights, uniformed patrol officers, reflective vests, outdoor lighting, signs, cones and/or barricades, and flashlights, for the officers to mark as indicating how a particular roadblock was identified. (Gov. Ex. 2). This record even contains a box for "Other" with a space to write in any other indicators that may have been used to identify the roadblock. (Id.). Thus, the officers' failure to identify the roadblock checkpoint with signs does not render the roadblock checkpoint invalid.

The evidence shows that the roadblock checkpoint was well identified, and the officers clearly complied with HCPD policy. (Tr. at 12; Gov. Ex. 2). Accordingly, Cole's argument in this regard is without merit and the Court finds that the May 6, 2009, roadblock checkpoint was lawfully established and executed for the constitutional purpose of conducting a sobriety check and license and registration examination.[18]

---

[18] Cole also argues that the roadblock checkpoint was "not established or executed pursuant to the criteria set forth in [Edmond, 531 U.S. at 32]." [Doc. 24 at 12]. Edmond, however, considered "the constitutionality of a highway checkpoint program whose primary purpose is the discovery and interdiction of illegal narcotics." 531 U.S. at 34. In fact, while the Edmond court rejected "roadblocks which had the primary purpose to uncover evidence of ordinary criminal

2.      *The Subsequent Detention of Cole*

Cole argues that Officer McNure unlawfully detained him without reasonable suspicion or probable cause and questioned him in violation of his <u>Miranda</u> rights. [Doc. 24 at 12].  Even though an officer may have justification to initiate a traffic stop, the ensuing detention of a vehicle's occupant must not be excessively intrusive in that the officer's actions "must be reasonably related in scope to the circumstances which justified the interference in the first place."  <u>United States v. Boyce</u>, 351 F.3d 1102, 1106 (11th Cir. 2003) (<u>quoting</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968)).  <u>See also</u> <u>United States v. Cantu</u>, 227 Fed. App. 783, 785 (11th Cir. 2007) (*per curiam*) (unpublished). The stop must be of limited duration and may not last "'any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.'"  <u>Purcell</u>, 236 F.3d at 1277 (<u>quoting</u> <u>United States v. Holloman</u>, 113 F.3d 192, 196 (11th Cir. 1997) (*per curiam*)).  The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop."  <u>Id.</u>  The legality of a

_____

wrongdoing," it also suggested "that the government's interest in highway safety may . . . justify driver's license and registration checkpoints, so long as the 'primary purpose' of the roadblock was this important state interest, and not general crime control."  <u>Smith</u>, 2009 WL 5066811, at *10 (<u>citing</u> <u>Edmond</u>, 531 U.S. at 38, 41-42). Here, as previously stated, the roadblock checkpoint was established in order to conduct a sobriety check and license and registration examination, which has been found to be constitutional.  (Tr. at 11); <u>Sitz</u>, 496 U.S. at 444, 447.  Indeed, Cole has presented nothing to counter the government's evidence that this was the primary purpose of this roadblock checkpoint.  Therefore, <u>Edmond</u> is inapplicable to the facts of this case.

detention following a traffic stop may be jeopardized if an officer improperly extends its duration. United States v. Hernandez, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005) (in light of Muehler v. Mena, 544 U.S. 93, 100-01 (2005), proper focus is on the duration, not the scope of questioning).

An officer may prolong a stop: (1) to investigate the driver's license and the vehicle registration, including requesting a computer check; (2) while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation; (3) if the officer has "'articulable suspicion of other illegal activity'"; or (4) if the detainee consents. Boyce, 351 F.3d at 1106 & n.3 (quoting Purcell, 236 F.3d at 1277-78). Thus, where the initial stop is legal, the officer has "'the duty to investigate suspicious circumstances that then [come] to his attention.'" United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988)). In addition, insofar as officers are conducting a valid traffic stop, the officers are also permitted to order the suspect to exit the vehicle. Maryland v. Wilson, 519 U.S. 408, 414-15 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 110-11 & n.6 (1977) (per curiam) (holding that concern for a police officer's safety outweighed the slight intrusion on a motorist's liberty when the police officer, who had no reason to believe the motorist was armed or dangerous, directed the motorist stopped for a minor traffic infraction to step out of his vehicle).

21

When Cole reached the roadblock checkpoint, Officer McNure stopped his vehicle, introduced himself, and asked for Cole's driver's license.  (Tr. at 18, 23, 43). As Cole handed Officer McNure his driver's license, Officer McNure, who had shined his flashlight into the vehicle, observed a small bag containing what he believed was marijuana and a handgun clip or magazine in the center console area of Cole's vehicle.  (Tr. at 23-24, 43-46).  Officer McNure told Cole to hand him the bag, and Officer McNure recognized marijuana in the bag, so he had reasonable suspicion, and even probable cause, to detain Cole to investigate his possession of marijuana. (Tr. at 25, 50-51).  See United States v. Rodriguez, 312 Fed. App. 205, 210 (11th Cir. 2009) (per curiam) (unpublished) ("After [officer] saw the bag of methamphetamine on the center console, the officers had probable cause to arrest [defendant] . . . for [his] possession of the illegal substance and to search the vehicle for additional contraband.") (citing United States v. Pantoja-Soto, 739 F.2d 1520, 1524 (11th Cir. 1984) & United States v. Clark, 559 F.2d 420, 424 (5th Cir. 1977)[19]).  Therefore, based on the totality of the circumstances, Officer McNure decided to detain Cole and directed him to pull his vehicle to the side of the road, but he had not formally arrested Cole at this point.  (Tr. at 25, 50-51).

-----

[19] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

22

Cole challenges Officer McNure's use of a flashlight to illuminate the interior of his vehicle and contends that this conduct constitutes a search for purposes of the Fourth Amendment. [Doc. 24 at 12-13].[20] Specifically, Cole asserts that Officer McNure's "intrusion into the vehicle allowed McNure to gain a vantage point of something inside the vehicle that he would not have seen otherwise," and that he "had no legitimate reason to shine the flashlight into the vehicle." [Id. at 13]. To the contrary, "[i]lluminating the interior of a vehicle by means of a flashlight does not constitute a search." United States v. Bradley, No. CR409-167, 2009 WL 4281260, at *3 (S.D. Ga. Nov. 5, 2009) (citing Texas v. Brown, 460 U.S. 730, 739-40 (1983)) ("it is 'beyond dispute' that shining a flashlight to illuminate the interior of a car trenches upon no right secured under the Fourth Amendment") (citations omitted).

_____

[20] Cole also argues that Officer McNure "used the road block and license check as probable cause to investigate other criminal activity," and therefore, his seizure was unreasonable. [Doc. 24 at 13]. However, as previously noted, there is no evidence indicating that the primary purpose of the roadblock was to investigate narcotics violations or that Officer McNure used the roadblock as a pretext to conduct any investigation into other possible criminal activity. The credible testimony from the suppression hearing is that the roadblock was established as a sobriety check and license and registration examination and that the officers had no discretion in deciding which vehicles to stop because all vehicles that approached the roadblock on May 6, 2009, were stopped. (Tr. at 11, 20, 22). Thus, "[a] thorough review of the record leave[s] [the Court] with the firm conviction that that argument, cloaked in cursory allegations, is without merit." United States v. Corral, 823 F.2d 1389, 1392 (10th Cir. 1987) (rejecting a similar argument that a license and registration  roadblock was pretext for stopping defendant).

Indeed, "[a] law enforcement officer who peers into the interior of a vehicle during the course of a legitimate traffic stop is not conducting a search within the meaning of the Fourth Amendment," and "[t]his is the case even if the police officer shines his flashlight into the back seat of the vehicle." United States v. Gonzales, No. 09-CR-366-XR, 2010 WL 446471, at *2 (W.D. Tex. Feb. 1, 2010) (citations omitted). See also United States v. Harrison, No. 5:07-CR-410 (NAM), 2008 WL 2626829, at *6 n.5 (N.D.N.Y. June 27, 2008) ("[O]nce a vehicle is lawfully stopped, a police officer's looking through the windows into the vehicle from outside, even when shining a flashlight to illuminate the inside of the vehicle, does not constitute a search of the vehicle within the meaning of the Fourth Amendment.") (internal marks and citation omitted).  Accordingly, Cole's argument in this regard is without merit.[21]

### 3.      Questioning of Cole

After observing the bag of marijuana and the handgun clip, Officer McNure asked Cole to exit his vehicle and walk to the rear of the vehicle, which Cole did.  (Tr. at 25-26, 50-51).  Officer McNure then asked Cole about the marijuana and whether Cole "cared to explain it."  (Tr. at 26, 51).  Officer McNure also asked Cole about the

---

[21] In support of his position, Cole relies on two Georgia Court of Appeals cases.  [Doc. 24 at 12-13 (citing Barlow v. State, 252 S.E.2d 214 (Ga. App. 1979) & Vincent v. State, 342 S.E.2d 382 (Ga. App. 1986))].  These cases, however, do not support Cole's position that shining a flashlight in a vehicle constitutes a search for Fourth Amendment purposes and are therefore inapposite.

24

ownership of the magazine clip and whether there were any weapons in the vehicle. (Tr. at 26, 52).   In response, Cole made certain statements that he now seeks to suppress.  (Tr. at 26).  Thereafter, Officer McNure advised Cole that he was placing him under arrest for possession of marijuana.  (Tr. at 27, 47).

Cole argues that suppression of his statements is warranted because Officer McNure failed to advise him of his <u>Miranda</u> rights prior to asking these questions. [Doc. 24 at 14].  Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers unless the government "'demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'"  <u>United States v. Lueck</u>, 678 F.2d 895, 899 n.2 (11th Cir. 1982) (<u>quoting</u> <u>Miranda</u>, 384 U.S. at 444).  "An officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'"  <u>United States v. de los Santos</u>, No. 1:05-cv-372-WSD, 2007 WL 2331070, at *5 (N.D. Ga. Aug. 13, 2007) (internal marks and citations omitted); <u>Garcia v. Singletary</u>, 13 F.3d 1487, 1489 (11th Cir. 1994) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.") (<u>citing</u> <u>Miranda</u>, 384 U.S. at 444).  Thus, "*Miranda* warnings are required before any statement may be admitted into evidence at trial which was

elicited from a person in custody through interrogation." <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (internal marks and citation omitted).

    <u>Miranda</u> warnings do not generally need to be given during <u>Terry</u> stops or general traffic stops. <u>See</u> <u>United States v. Acosta</u>, 363 F.3d 1141, 1148-49 (11th Cir. 2004) (<u>citing</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 435-37 (1984)). In fact, "[t]he very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights." <u>United States v. Rone</u>, Criminal Action No. 1:05CR-11-M, 2006 WL 1687780, at *5 (W.D. Ky. June 19, 2006) (internal marks and citation omitted). Although a driver detained during a typical traffic stop is not free to leave, the Supreme Court has "recognized two key factors which, in the context of a traffic stop, mitigate the pressures upon a detained person so that his ability to exercise his privilege against self incrimination is not so impaired that he need be warned of his constitutional rights under *Miranda*." <u>Acosta</u>, 363 F.3d at 1149 (<u>quoting</u> <u>Berkemer</u>, 468 U.S. at 437). "First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief," since traffic stops ordinarily last only a few minutes and differ from a stationhouse interrogation, "which frequently is prolonged, and . . . the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." <u>Id.</u> (internal marks omitted). Second, most traffic detainees would not feel "completely at the mercy of the police,"

as the inherent authority of armed police officers is "more than offset by other aspects of such a stop." Id. at 1149-50 (internal marks omitted) (i.e., passersby witnessing the interaction).   A stopped motorist is considered "in custody" if he is "subjected to treatment that renders him 'in custody' for practical purposes." Berkemer, 468 U.S. at 440. United States v. Crawford, 294 Fed. App. 466, 473 (11th Cir. 2008) (*per curiam*) (unpublished).

Cole's statements are not due to be suppressed because he was not in custody when questioned by Officer McNure.  Although Officer McNure asked Cole to exit the vehicle, and he testified that Cole was not free to go, (Tr. at 51), Cole was not handcuffed and had not been told that he was under arrest at the time of the questioning.  (Tr. at 25-27).  The fact that Officer McNure asked Cole to exit the vehicle does not alone convert a stop into a custodial situation.  United States v. Nguyen, No. 2:05CR130-3, 2006 WL 2260104, at *8 (D. Vt. Aug. 7, 2006).  See also Wilson, 519 U.S. at 414-15; Mimms, 434 U.S. at 110-11 & n.6.  Additionally, the questioning was brief, and only Officer McNure was standing near Cole during the questioning.  (Tr. at 25-27).  The record does not indicate that any officers present were displaying weapons or acting in a threatening or coercive manner.  See United States v. Valenzuela-Valenzuela, Criminal No. 07-228 (JNE/SRN), 2007 WL 2695631, at *5 (D. Minn. Sept. 11, 2007), adopted at *1 (no formal arrest or custody where agent

did not use "strong-arm tactics or deceptive stratagems," never told defendants they were under arrest and did not draw his weapon, questioning was brief, and only two officers were outside the vehicle although other officers were at the scene). Moreover, even though Officer McNure had probable cause to arrest Cole when he questioned him, this factor did not render Cole in custody for <u>Miranda</u> purposes. <u>United States v. Hudson</u>, 210 F.3d 1184, 1192 (10th Cir. 2000).

Similar to the defendant in <u>Acosta</u>, Cole's vehicle was not stopped in a "remote area far from public scrutiny," but was on the side of the road near the roadblock checkpoint where the officer's actions were visible to anyone who looked. Cole was not questioned at gunpoint, he was not forced to lie down, no physical force was used against him, he was not handcuffed or told he was under arrest, and he was not placed in a police car before or during questioning. <u>See</u> <u>Acosta</u>, 363 F.3d at 1149-50; (Tr. at 127, 158-59). <u>See also</u> <u>United States v. Mastera</u>, No. CRIM. 04-50-P-S, 2004 WL 1770139, at *3 (D. Me. Aug. 6, 2004) (no custodial situation where defendant was questioned in neutral surroundings with only one officer present, no physical restraints were placed on him, and the "duration of the interrogation was short," and "the character of the interrogation was not threatening"). In fact, at the time of Officer McNure's questioning, there had not been such a "restriction on [Cole's] freedom as to render him in custody." <u>de los Santos</u>, 2007 WL 2331070, at *5. Indeed,

it is evident that Cole was not yet in custody when questioned at the rear of the vehicle because when Officer McNure did attempt to place Cole under arrest and handcuff him, Cole began to struggle, "bolted back towards the driver's seat," and was reaching into the driver's seat with his right arm towards the middle console area of the vehicle.  (Tr. at 27-29).  Officer McNure, with the help of another officer, was finally able to pull Cole out of the vehicle and place him in handcuffs.  (Tr. at 29-30, 32).  Thus, the Court finds that Cole's statements at the scene prior to his arrest were not taken in violation of <u>Miranda</u>, and are not due to be suppressed.

**4.    *The Search of Cole's Vehicle***

Cole also seeks to suppress evidence seized during the search of his vehicle, arguing that the automobile exception does not apply "since law enforcement had [him] in custody and secured in the back of a patrol car," and that it was not lawful under <u>Arizona v. Gant</u>, — U.S. –-, 129 S. Ct. 1710 (2009).  [Doc. 24 at 15-16].  The government argues that the search of the vehicle after Cole's arrest was a lawful search incident to his arrest, was based on probable cause, and was pursuant to a routine inventory search.[22]  [Doc. 22 at 27-38; Doc. 25 at 10-12].

_____

[22] While the government argues that the search of Cole's vehicle was pursuant to an inventory, "[i]n order to uphold a search under the inventory search doctrine, the police must first have the authority to impound the vehicle and must then follow the procedures outlined in their standardized policy." <u>United States v. Moore</u>, No. 2:05-CR-50-FTM-29, 2006 WL 560640, at *6 (M.D. Fla. Mar. 7, 2006) (<u>citing</u> <u>Colorado v. Bertine</u>, 479 U.S. 367, 375 (1987) & <u>United States v. Williams</u>, 936 F.2d 1243, 1248 (11th Cir. 1991)).  "The government bears the burden of proving these elements." <u>Id.</u> (<u>citing</u> <u>Sammons v. Taylor</u>, 967 F.2d 1533, 1543 (11th Cir. 1992)).  "To prove

The government argues that the vehicle search was a lawful search incident to arrest, and falls under the exception carved out by the Supreme Court in Gant.  [Doc. 22 at 35].  In Gant, officers stopped a vehicle because the defendant was driving on a suspended license.  129 S. Ct. at 1714-15.  After the defendant was handcuffed and placed in a patrol vehicle, his vehicle was searched incident to arrest.  Id. at 1715.  On appeal from the Arizona Supreme Court's decision concluding that the search of Gant's vehicle was unreasonable within the meaning of the Fourth Amendment, the United States Supreme Court affirmed, explaining that the broad scope of vehicle searches permitted under the prevailing circuit court interpretation of New York v. Belton, 453 U.S. 454 (1981), was incorrect.  Id. at 1715, 1719, 1724.  The Court reasoned that officer safety concerns are sufficiently addressed if officers are permitted to conduct a vehicle search only when an arrestee is actually within reaching distance of the vehicle.  Id. at 1721.  The Court noted that under this rule, "it will be the rare case in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains."  Id. at 1719 n.4 (citation omitted).

_____

standardized criteria, the government may rely on written regulations or testimony concerning standard practices."  United States v. Miller, 382 F. Supp. 2d 350, 377 (N.D.N.Y. 2005) (citations omitted).  Here, while the government presented written procedures and elicited testimony at the evidentiary hearing concerning the officers' standard practices with regard to the inventory and impound of a vehicle, (Tr. at 37, 59, 61; Gov. Exs. 6 & 7), the Court need not address this argument as it finds that the search of the vehicle was based on probable cause and lawful incident to arrest under Gant, 129 S. Ct. at 1710.

Therefore, the Supreme Court held:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest.  When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

Id. at 1723-24 (emphasis added).  Here, while the Court agrees that "a reasonable officer could not consider [Cole] capable of accessing his vehicle at the time the search was conducted," United States v. Goldsmith, Criminal Action No. 4:09cr94, 2009 WL 4884408, at *3 (E.D. Tex. Dec. 10, 2009), adopted at *1, the officers' search of Cole's vehicle was lawful under Gant because the officers had a reasonable basis to believe the search would uncover evidence relevant to Cole's arrest for possession of marijuana– namely, marijuana.  See United States v. Cole, Crim. No. 09-cr-00029, 2010 WL 724382, at *2 (D.V.I. Mar. 1, 2010) (finding search of vehicle pursuant to Gant lawful where officer arrested defendant for possession of marijuana and believed that evidence of that arrest would be located in vehicle since he detected the odor of marijuana and observed marijuana in plain view on the console of the vehicle); United States v. Bradford, No. 09-CR-71, 2009 WL 3754174, at *9 (E.D. Wis. Nov. 5, 2009), adopted at *5 (finding search of vehicle for evidence relating to the defendant's possession of a crack pipe reasonable under Gant); United States v. Reynolds, No. 3:08-CR-143, 2009 WL 1588413, at *3  (E.D. Tenn. June 4, 2009)

(reasonable to search vehicle incident to defendant's arrest for possession of marijuana pursuant to exception in Gant).

Additionally, "[w]hile *Gant* limits the search incident to arrest exception, *Gant* also affirmed the viability of the probable cause exception for automobiles." Goldsmith, 2009 WL 4884408, at *3 (citing Gant, 129 S.Ct. at 1719). "The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a warrant is obtained." United States v. Thomas, 536 F. Supp. 736, 742 (M.D. Ala. 1982). See also Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988). Thus, a warrantless search of a vehicle is authorized where probable cause coupled with exigent circumstances is present. Thomas, 536 F. Supp. at 742 (citing Coolidge v. New Hampshire, 403 U.S. 443, 458-64 (1971)).

Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" Alexander, 835 F.2d at 1409 (quoting Clark, 559 F.2d at 424) (alteration in original). In determining whether probable cause exists, the Court "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation.'" United States v. Olmedo, 552 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008), adopted at 1350 (quoting United States v. Willis, 759

F.2d 1486, 1494 (11th Cir. 1985) (citation omitted)).  Exigent circumstances exist by the mere potential mobility of the vehicle.  United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990) (the requirement of exigent circumstances is satisfied by the "ready mobility" inherent in all vehicles that reasonably appear to be capable of functioning).  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  United States v. Ross, 456 U.S. 798, 825 (1982).

In this case, the warrantless search of the vehicle was supported by probable cause to believe it contained contraband.[23]  Indeed, Officer McNure, who stopped Cole and observed the marijuana in plain view on the center console of Cole's vehicle, "had probable cause to believe that [contraband] was in [Cole's] vehicle." United States v. Richard, Criminal Action No. 4:09cr37, 2009 WL 2169892, at *7 (E.D. Tex. July 20, 2009), adopted at *1.  See also United States v. Edwards, 307 Fed. App. 340, 344 (11th Cir. 2009) (per curiam) (unpublished) (affirming ruling that officer's observation in plain view of bag of marijuana in defendant's vehicle provided probable cause to search vehicle pursuant to the automobile exception).  Under the circumstances of this case, the officers clearly had probable cause to search Cole's

---

[23] The exigency requirement is satisfied as the vehicle had recently been observed in motion, therefore showing its mobility.  See United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (per curiam) (mobility is satisfied merely if "the automobile is operational").

vehicle, and the search of the vehicle was valid under <u>Gant</u>. <u>Edwards</u>, 307 Fed. App. at 344. Accordingly, the Court finds that the evidence seized as a result of the search of Cole's vehicle is not due to be suppressed.

**5.** *Interview of Cole at the HCPD*

Cole contends that statements he made during the interview conducted by Agent Allen at the HCPD should be suppressed because he did not validly waive his <u>Miranda</u> rights. [Doc. 24 at 17-18]. Specifically, Cole argues that Agent Allen "simply asked [him] if he 'would mind answering some questions,'" and denies that he validly waived his rights in response. [<u>Id.</u> at 17 (<u>citing</u> Tr. at 67)]. The testimony from the suppression hearing, however, is to the contrary.

"The government bears the burden of proving by a preponderance of evidence that [Cole] validly waived [his] *Miranda* rights." <u>United States v. Harrold</u>, 679 F. Supp. 2d, 1336, 1349 (N.D. Ga. 2009), adopted at 1338 (citations omitted). "A waiver of one's *Miranda* rights need not be express to be valid." <u>United States v. Deal</u>, No. 3:08-cr-368-J-34JRK, 2009 WL 5386061, at *13 (M.D. Fla. July 29, 2009), adopted in relevant part at No. 3080-cr-368-J-34JRK, 2010 WL 148458, at *1 (M.D. Fla. Jan. 12, 2010) (<u>citing</u> <u>N. Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)). Rather, "[t]he question is whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." <u>Id.</u> (internal marks and citation omitted). That is, "[w]hen a suspect speaks to law enforcement officers of his own free will after being

34

advised as required by *Miranda*, a waiver of those rights may be implied." Id.

(citations omitted). "Whether a defendant validly waived his or her Miranda rights

is determined by examining the totality of the circumstances." Harrold, 679 D. Supp.

2d at 1350-51 (quoting United States v. Minard, 208 Fed. App. 657, 660 (10th Cir.

2006) (unpublished) ("'[T]he totality of the circumstances must demonstrate a

defendant waived his rights with a requisite level of comprehension.'")).

The evidence shows that Agent Allen arrived at the HCPD at approximately

6:30 a.m. on May 6, entered the interview room where Cole was seated, introduced

himself to Cole, and in the presence of another officer, advised Cole of his Miranda

rights by reading the rights from a DEA-13A Form. (Tr. at 64-66; Gov. Exs. 8, 9, &

10). Agent Allen advised Cole that he had the right to remain silent and that any

statements he made could be used against him in court. (Tr. at 65; Gov. Ex. 8). He

further advised Cole that he had the right to speak to an attorney, to have one present

during the questioning, and to have one appointed for him if he could not afford one.

(Id.). After he read Cole his Miranda rights, Agent Allen asked Cole if he would

answer some questions and Cole responded that he would speak to him. (Tr. at 66-

67). Thereafter, Cole made statements regarding the large amount of currency seized

from his vehicle and his music label company called "Unit Entertainment," but after

Agent Allen asked more questions about Unit Entertainment, Cole indicated that he

wanted to speak with his attorney. (Tr. at 67-68). Agent Allen then concluded the

interview.  (Tr. at 67).

When Agent Allen advised Cole of his <u>Miranda</u> rights, Cole did not ask him to repeat anything, ask any questions, or give any indication that he did not understand what was being read.  <u>Harrold</u>, 679 F. Supp. 2d at 1351.  When Agent Allen asked Cole if he would answer some questions, Cole affirmatively responded and then made certain statements.  (Tr. at 66-68).  Even if Cole did not expressly waive his rights, he impliedly waived his rights by speaking with the Agent Allen after being advised of his rights.  <u>Deal</u>, 2009 WL 5386061, at *13.

In addition, there is no evidence that Cole was threatened or coerced in any way to waive his rights and speak with the agents.  Indeed, the evidence shows that after about 10 to 15 minutes had passed, Cole indicated that he wanted to speak with his attorney, and the interview was concluded.  (Tr. at 67-68).  Thus, Cole clearly understood his rights, agreed to speak with Agent Allen, and then, after about 10 to 15 minutes of questioning, invoked his right to an attorney and ended the interview. Under the totality of these circumstances, the Court finds that Cole validly waived his <u>Miranda</u> rights, and suppression of the statements he made to Agent Allen is not warranted.  <u>United States v. Palmer</u>, No. CR209-35, 2010 WL 883727, at *2 (S.D. Ga. Mar. 11, 2010), adopted at *1.[24]

――――――――――――

[24] At some point after the officers returned to the HCPD, they took the money seized from Cole's vehicle and placed it in three brown paper bags, which were then

**6.**    *Search of Cole's Cell Phone*

At some point after Cole was arrested on May 6, 2009, Agent Allen searched

the recent calls and contacts stored on the Motorola cell phone that HCPD officers

seized from Cole's vehicle. (Tr. at 35, 69-70).  Cole asserts that the warrantless search

of his cell phone violated his Fourth Amendment rights and, therefore, any evidence

obtained therefrom must be suppressed.  [Doc. 12 at 7; Doc. 24 at 18-24].  The

government contends that the cell phone was lawfully seized and searched as "part

of the inventory search" and "in order to preserve evidence."  [Doc. 22 at 42].  The

government also maintains that since the cell phone was properly seized from Cole's

vehicle as evidence, law enforcement officers were authorized to subsequently

---

lined up alongside three empty brown paper bags.  (Tr. at 38-39).  A canine sniff of
the packages was conducted and Officer McNure observed the canine direct his
attention to the paper bags containing the money.  (Tr. at 39-40).  Cole contends that
evidence derived from the canine sniff should be suppressed because it was illegal
since the government failed to present any evidence that the particular canine used
was a certified or trained canine in detecting narcotics.  [Doc. 24 at 16-17].  However,
the currency was lawfully seized as a result of a search of Cole's vehicle on May 6,
2009, and not because of the canine sniff at the HCPD.  Thus, even though there is
no evidence concerning the training of the particular canine at issue here, there is no
evidence to suppress as a result of this canine sniff.  Indeed, "evidence will not be
excluded if police discover the evidence from a source independent from the illegal
conduct."  United States v. Jackson, 548 F. Supp. 2d 1314, 1324 (M.D. Fla. 2008)
(citing Segura v. United States, 468 U.S. 796, 805 (1984)).  Furthermore, as the
government points out, [Doc. 25 at 14 n.7], to the extent Cole actually seeks to
exclude Officer McNure's testimony regarding the canine sniff and subsequent alert,
the proper procedural avenue for such an exclusion is to file a motion in limine, not
a motion to suppress evidence.  Accordingly, Cole's argument with regard to the
canine sniff is without merit.

review its contents without seeking a warrant.  [Id.].

Courts have recognized that there is a reasonable expectation of privacy regarding information stored in cell phones.  United States v. Finley, 477 F.3d 250, 259 (5th Cir. 2007).   "Consequently, the Fourth Amendment require[s] law enforcement officers to obtain a warrant to search the cell phone unless a recognized exception to the warrant requirement exist[s]."   United States v. McGhee, No. 8:09CR31, 2009 WL 2424101, at *3 (D. Neb. July 21, 2009), adopted at *1.   The government cites United States v. Murphy, 552 F.3d 405, 412 (4th Cir. 2009), for the proposition that a cell phone may be searched without a warrant as part of an inventory, but the government presented no evidence that Agent Allen searched the cell phone at issue pursuant to an inventory procedure or that he did so to preserve evidence.[25]

The only testimony presented at the evidentiary hearing regarding the search of the cell phone was elicited on cross-examination by Cole's counsel.   (Tr. at 69). Agent Allen simply acknowledged on cross-examination that he searched the recent

_____

[25] "Few courts have addressed whether the search of a cellular phone can be conducted as part of an inventory search, but at least two of [the] federal district courts that have considered this question have determined that the search of a cellular phone's contents is not a proper inventory search."   United States v. Chappell, Crim. No. 09-139 (JNE/JJK), 2010 WL 1131474, at *15 (D. Minn. Jan. 12, 2010) (citing United States v. Wall, No. 08-60016-CR, 2008 WL 5381412, at *4 (S.D. Fla. Dec. 22, 2008) & United States v. Park, No. CR 05-375 SI, 2007 WL 1521573, at *10-12 (N.D. Cal. May 23, 2007)).

calls and contacts on the cell phone without a search warrant and without Cole's consent.  (Id.).  He did not testify as to his reasons for searching the cell phone or otherwise indicate that he searched the cell phone to preserve evidence.  (Id.).  Thus, "[t]here is no evidence that [Agent Allen] was searching through the data stored on the phone, including its memory of the phone numbers of ingoing and outgoing calls . . . to confirm [Cole's] identity, to protect [Cole's] property from theft or the [HCPD] from a lawsuit, to ensure the safety of officers, or because he had reason to believe that evidence on the phone would be destroyed."  Chappell, 2010 WL 1131474, at *15.

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution."  United States v. Suarez-Blanca, No. 1:07-CR-0023-MHS/AJB, [Doc. 87 at 45] (N.D. Ga. Jan. 22, 2008), adopted at [Doc. 152] (N.D. Ga. June 30, 2008) (citing United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted)). Because the record is devoid of any facts supporting the government's assertion that Agent Allen conducted an inventory search of the cell phone to preserve evidence, the government has not carried its burden with respect to the warrantless search of the cell phone on this basis.

The government also relies on Murphy to support its contention that since the cell phone was properly seized from Cole's vehicle as evidence, Agent Allen was

39

authorized to subsequently search the contents of the cell phone without a warrant. In <u>Murphy</u>, the Fourth Circuit ruled that a federal agent was authorized to conduct a warrantless search of the contents of a cell phone properly seized as evidence by state law enforcement officers weeks earlier.  552 F.3d at 412.  The cell phone at issue in <u>Murphy</u> was seized by a state trooper from the person of the defendant upon his arrest for obstruction of justice following a traffic stop on June 6, 2006.  <u>Id.</u> at 407-08. An inventory of the vehicle in which the defendant was a passenger was initiated at the scene and subsequently completed at the sheriff's department.  <u>Id.</u> at 409.   The cell phone seized from the defendant, along with other cell phones recovered from the vehicle, were examined during the inventory at the sheriff's department and determined to contain possible incriminating evidence, so they were logged in as evidence.   <u>Id.</u>   The  evidence  in  the  case  was  later  turned  over  to  the  Drug Enforcement Administration ("DEA"), and on June 29, 2006, a DEA agent examined the defendant's cell phone without obtaining a search warrant, and he discovered several text messages from an individual who later identified the defendant as his drug supplier.   <u>Id.</u>  The Fourth Circuit ruled that "once the cell phone was held for evidence, other officers and investigators were entitled to conduct a further review of its contents, as [the DEA agent] did, without seeking a warrant."  <u>Id.</u> at 412 (<u>citing</u> <u>United States v. Edwards</u>, 415 U.S. 800, 802-03 (1974)).

Although the rationale of the <u>Murphy</u> decision is not entirely persuasive, the Court does find that the cell phone was lawfully seized and searched under the automobile exception to the warrant requirement.[26]  <u>California v. Acevedo</u>, 500 U.S. 565, 573-76 (1991); <u>Ross</u>, 456 U.S. at 809, 823.  "[U]nder the automobile exception to the warrant requirement, officers can search any container in an operational car without a warrant as long as they have probable cause to believe that the container holds evidence of a crime." <u>Suarez-Blanca</u>, No. 1:07-CR-0023-MHS/AJB, [Doc. 87 at 45].  Cole's vehicle was operational since he was stopped at the roadblock checkpoint while driving it.  As discussed earlier, during the encounter at the checkpoint, Officer McNure observed a bag of marijuana and a loaded handgun clip in the center console of Cole's vehicle, (Tr. at 23-24, 43, 45-46), and, therefore, he had probable cause to search the vehicle for evidence of a drug crime.  <u>Edwards</u>, 307 Fed. App. at 344.

Officer McNure's probable cause to believe the vehicle held evidence of a drug crime was further reinforced when he opened the doors of Cole's vehicle and smelled a strong odor of raw marijuana.  <u>United States v. Lork</u>, 132 Fed. App. 34, 35 (5th Cir. 2005) (*per curiam*) (unpublished) (detectable odor of marijuana emanating from a vehicle provides probable cause for the search of the vehicle) (citation omitted); (Tr.

---

[26]As noted earlier, "*Gant* did not do away with the 'automobile exception' to the warrant requirement." <u>United States v. Ramos-Rogel</u>, No. 09-40117-01-KES, 2010 WL 1492859, at *4 (D.S.D. Apr. 13, 2010) (citation omitted).

at 30).  During the lawful search of the vehicle, Officer McNure found over $50,000 in cash in a shoe box along with several firearms and cell phones.  (Tr. at 31, 35-36). A cell phone is "a known tool of the drug trade," Nixon, 918 F.2d at 900, and the presence of the firearms and a large amount of cash in the vehicle, which had a strong odor of raw marijuana, provided probable cause to search the cell phones found in the vehicle for evidence of drug trafficking.  See United States v. Brooks, 594 F.3d 488, 495 (6th Cir. 2010) ("Courts have readily acknowledged that large sums of cash are indicative of the drug trade" and "the indication [was] confirmed by the presence of the marijuana seeds and the odor of marijuana smoke."); United States v. Carico, 311 Fed. App. 572, 574 (4th Cir. 2008) (*per curiam*) (unpublished) (multiple weapons and a large quantity of cash found during initial search of vehicle provided probable cause for more thorough search of vehicle); United States v. Mendoza-Salgado, 964 F.2d 993, 1008 (10th Cir. 1992) ("The courts generally view items such as firearms, large quantities of cash, and uncharged quantities of drugs as 'tools of the trade' for distributing illegal drugs."); United States v. McGhee, 672 F. Supp. 2d 804, 813 (S.D. Ohio 2009) (officer who observed marijuana in plain view had probable cause to believe that contraband would be found in the vehicle, particularly since a large amount of cash was found on defendant's person, "suggesting that the occupants of the vehicle were involved in drug activity.").

"Because probable cause existed to believe that evidence of a crime would be found in the cell phone call records and address book, the automobile exception allows the search of the cell phone just as it allows a search of other closed containers found in vehicles." United States v. James, No. 1:06CR134 CDP, 2008 WL 1925032, at *4 (E.D. Mo. Apr. 29, 2008); United States v. Fierros-Alavarez, 547 F. Supp. 2d 1206, 1213-14 (D. Kan. 2008) (automobile exception justified search of cell phone found in vehicle); Suarez-Blanca, No. 1:07-CR-0023-MHS/AJB, [Doc. 87 at 48] (agents had probable cause to conduct warrantless search of cell phone seized from rental truck).[27]  Thus, Agent Allen lawfully searched the cell phone under the automobile exception to the warrant requirement.[28]

---

[27] Cole cites Park, 2007 WL 1521573, at *9-11, and other cases that have held that a warrantless search of a cell phone was not justified as a search incident to arrest or a booking search.  [Doc. 24 at 22-24].  However, these cases are not relevant to the Court's analysis of the automobile exception.  See United States v. Meador, No. 1:06 CR 134 CDP DDN, 2008 WL 4922001, at *13-15  (E.D. Mo. Jan. 7, 2008).

[28] It is not entirely clear from the record when Agent Allen searched the cell phone, but on cross-examination, he testified that he searched the cell phone "in addition to" interviewing Cole on the morning of May 6, 2009.  (Tr. at 69).  However, the fact that he did not search the cell phone "contemporaneously with its lawful seizure" is inconsequential as he had probable cause to search the cell phone. United States v. Johns, 469 U.S. 478, 479-80 (1985) (approving three-day delay in searching packages removed from a vehicle).

43

**B.     The December 16 2009, Arrest and Search of Residence**

   **1.     *Initial Entry***

Although Cole argues that the initial warrantless entry of the residence was illegal, he does not present any specific arguments regarding the entry. [Doc. 24 at 24]. To the extent Cole contends that the agents' initial entry into the residence violated the Fourth Amendment, the Court will briefly address this issue. The principle intrusion against which the Fourth Amendment is aimed is physical entry into one's home. Payton v. New York, 445 U.S. 573, 585 (1980) (citation and quotations omitted). However, when law enforcement agents are armed with a valid arrest warrant, i.e., an arrest warrant founded upon probable cause,[29] they possess the "limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603.

In assessing whether law enforcement agents possessed lawful authority to enter a residence pursuant to a valid arrest warrant, courts inquire into two matters: first, whether there existed a reasonable belief that the location to be searched was the suspect's dwelling; and second, whether the agents had "reason to believe" that the suspect was within the dwelling at the time of entry. United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000); United States v. Magluta, 44 F.3d 1530, 1533 (11th Cir.

---

[29] Cole does not dispute the validity of the arrest warrant.

1995).  All facts and circumstances within the knowledge of the law enforcement agents are relevant to this analysis and are viewed in their totality, and common sense factors guide the analysis.  Bervaldi, 226 F.3d at 1263; Magluta, 44 F.3d at 1535. The Court must make a common sense assessment of the facts known to the law enforcement agents in this case and determine whether they had "reason to believe" Cole was residing at the 1228 Ithaca Drive residence.[30]

A warrant was issued for Cole's arrest on October 22, 2009, for knowingly possessing a firearm after a felony conviction in violation of 18 U.S.C. § 922(g).  (Tr. at 72, 86; Gov. Exs. 11 & 12).  The following day, Agent Sheppard was assigned the fugitive investigation in Atlanta, and he developed information from a database search that connected Cole to 1228 Ithaca Drive in McDonough, Georgia.  (Tr. at 71-73, 86-87, 103).  Agent Sheppard also received information from a postal inspector that Cole and an individual named Keith Cole were receiving mail at that address.

_____

[30] The Eleventh Circuit has held that "reasonable belief is different than probable cause," Bervaldi, 226 F.3d at 1265 (citing Magluta, 44 F.3d at 1534-35), and several other circuits have reached a similar conclusion.  See United States v. Thomas, 429 F.3d 282, 286 (D.C. Cir. 2005); Valdez v. McPheters, 172 F.3d 1220, 1225-26 (10th Cir. 1999); United States v. Route, 104 F.3d 59, 62 (5th Cir. 1997); United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996); United States v. Lauter, 57 F.3d 212, 215 (2d Cir. 1995).  However, the Ninth Circuit and the Sixth Circuit, in dicta, have equated the reasonable belief standard to probable cause.  United States v. Hardin, 539 F.3d 404, 416 n.6 (6th Cir. 2008); United States v. Gorman, 314 F.3d 1105, 1110 (9th Cir. 2002).  The Court will apply the "reason to believe" standard consistent with Eleventh Circuit precedent.

45

(Tr. at 73, 88-89, 92).  Thereafter, Agent Sheppard initiated surveillance at 1228 Ithaca Drive, and on December 16, 2009, he observed the black BMW Cole was arrested in on May 6 pull into the driveway, at which time he identified the driver as Cole.  (Tr. at 73-74, 76-77, 91).[31]  Cole stopped his vehicle in the driveway and Agent Sheppard observed Cole's girlfriend exit the residence and converse with Cole for two to three minutes.  (Tr. at 76-77).  Subsequently, Cole pulled his vehicle into the garage, parked, and entered the residence.  (Tr. at 77).  Immediately thereafter, Agent Sheppard observed Cole's girlfriend leave the residence in a white Mercedes.  (Tr. at 77, 91).  Agent Sheppard called for backup and was relieved of his position by another agent who continued surveillance of the residence.  (Tr. at 76-78).  When Agent Sheppard returned to the residence with his arrest team, Cole was still inside the residence, and after the agents knocked on the door of the residence and announced their presence, someone peeked out of the window, but no one came to the door.  (Tr. at 78-79, 95, 97, 108-09).

The database search coupled with the information from the postal inspector led Agent Sheppard to focus his attention on the 1228 Ithaca Drive residence, and surveillance of the residence indicated that Cole was residing there.  Based on the

---

[31] Approximately a week and a half earlier, another agent surveilling the residence observed the same black BMW leave the residence, but the agent was unable to identify the driver at the time.  (Tr. at 89-90).

surveillance on December 16, the agents had reason to believe that Cole was at the residence when they arrived to execute the arrest warrant. Thus, the totality of the information the agents had before entering the residence provided them with reason to believe that Cole was residing at the 1228 Ithaca Drive residence and would be there at the time they made entry. See Magluta, 44 F.3d at 1537-38; Bervaldi, 226 F.3d at 1267; United States v. Woods, 560 F.2d 660, 665 (5th Cir. 1977); Thomas, 429 F.3d at 286; Solis-Alarcon v. United States, 514 F. Supp. 2d 185, 193, 197-98 (D.P.R. 2007). Accordingly, the agents lawfully entered the residence to execute the arrest warrant.

### 2.    *Knock-and-Announce Requirement*

Cole also argues that the agents violated the Fourth Amendment knock-and-announce requirement codified at 18 U.S.C. § 3109 by forcing entry into the house within a second of only knocking twice when no exigency existed to justify the forcible intrusion. [Doc. 24 at 24-25]. Cole therefore argues that any statements obtained and items seized from the residence after the agents entered should be suppressed under the exclusionary rule. [Id.].

"The Fourth Amendment requires that 'law enforcement officers [executing arrest warrants] must announce their presence and provide residents an opportunity to open the door. . . .'" United States v. McZilkey, No. CR 107-052, 2007 WL 3046498, at *4 (S.D. Ga. Oct. 16, 2007), adopted at *1 (quoting Hudson v. Michigan, 547 U.S.

586, 589 (2006) (citation omitted)).   That is, when executing an arrest or search warrant, "federal and state officers must provide the occupants of a house with notice of authority and purpose before breaking open any outer or inner door or window." United States v. Smith, Crim.A.No. 4-96-CR-15 HLM, 1996 WL 735569, at *2 (N.D. Ga. Aug. 27, 1996) (citations omitted).

The Eleventh Circuit has held that while the Fourth Amendment does not explicitly set forth a knock-and-announce principle, the Amendment "incorporates the important common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." United States v. Segura-Baltazar, 448 F.3d 1281, 1289 (11th Cir. 2006) (citing Wilson v. Arkansas, 514 U.S. 927, 930, 934 (1995)).   The federal knock-and-announce statute, which applies to the execution of both arrest and search warrants, provides that if an officer gives notice of his authority and purpose and is refused admittance or must "liberate himself or a person aiding him in the execution of the warrant," the officer may break open any "outer or inner door or window of a house, or any part of a house, or anything therein," to execute the warrant.   18 U.S.C. § 3109. See United States v. Gay, 240 F.3d 1222, 1228 (10th Cir. 2001) (citing Miller v. United States, 357 U.S. 301, 308-309 (1958)).   "If the occupants do not admit the officers within a reasonable period of time, the officers may be deemed to be constructively

48

refused admittance, and they may then enter by force." Gay, 240 F.3d at 1228 (internal marks and citations omitted). The statute "does not entitle a defendant to greater protections than does the Fourth Amendment." Segura-Baltazar, 448 F.3d at 1290 n.4 (internal marks and citation omitted).

Courts have held that there are no particular words or phrases officers must speak before entering. See Storck v. City of Coral Springs, 354 F.3d 1307, 1318 (11th Cir. 2003) ("the Fourth Amendment normally requires little more notice than a knock on the door prior to a forced entry pursuant to a lawfully issued warrant"). "The focus of the 'knock and announce' rule 'is properly not on what magic words are spoken by police,' or whether the police rang the doorbell, 'but rather on how these words and other actions of the police will be perceived by the occupant.'" United States v. Pinson, 321 F.3d 558, 566 (6th Cir. 2003) (quoting United States v. Spikes, 158 F.3d 913, 925 (6th Cir. 1998)) (internal marks and citation omitted). "The proper trigger point, therefore, is when those inside should have been alerted that the police wanted entry to execute a warrant." Id. (internal marks and citation omitted).

Cole argues that the agents violated the knock-and-announce requirement when they forced entry into the residence within a second of announcing their presence, and immediately breached the door after the second knock. [Doc. 24 at 24-25]. The record, however, demonstrates that the agents approached the residence,

49

knocked on the front door, and announced their presence. (Tr. at 79, 109). After this initial knock, Agent Sheppard noticed someone peeking through the blinds from an upstairs window, but he could not identify whether the individual was male or female. (Tr. at 79, 97, 109). Agent Sheppard then knocked two more times and, after waiting 30 to 45 seconds with no response, he and the other agents forcibly entered the residence by breaching the front door. (Tr. at 79-80, 109). Based on these facts, the Court finds that the agents did not violate the knock-and-announce requirement. See Segura-Baltazar, 448 F.3d at 1289; Smith, 1996 WL 735569, at *2.

Cole relies on Cotton's testimony to support his argument that the agents violated the knock-and announce requirement. [Doc. 24 at 24-25]. Cotton, who was present inside the residence at the time the agents executed the arrest warrant, testified that she was upstairs when she heard what sounded like brakes of a car. (Tr. at 94, 98, 130-31, 134, 144). She stated that she peered out of the upstairs window and observed 10 to 15 unmarked cars. (Tr. at 134). She testified that she yelled to Cole, who was playing loud music on the computer, that there were cars in the front yard. (Tr. at 134-35). She stated that after Cole put on some sweatpants and was halfway to the door, she heard two knocks immediately following each other and that the agents breached the door and entered the residence within one second of the second knock. (Tr. at 135-36).

50

While Cotton testified that she only heard two knocks after she looked out of the window, her testimony does not directly contradict the agents' testimony that they had earlier knocked and announced their presence. In fact, Cotton testified that Cole was playing loud music and that she had to "yell over some music on the computer" in order to tell Cole that there were cars outside. (Tr. at 134). Moreover, Cotton's testimony is consistent with that of Agents Sheppard and Arrugueta to the extent that all three indicated that, at a minimum, the agents knocked twice before entering the residence after an individual peered out of an upstairs window. (Tr. at 79-80, 97, 109). Thus, the credible evidence from the suppression hearing demonstrates that the agents did knock and announce, and based on their observation of someone peering outside of the upstairs window, "[t]hey had legitimate concerns about safety . . . that prompted their entry after their knock and announce went unanswered." United States v. Robinson, No. 08-60179-CR, 2008 WL 5381824, at *11 (S.D. Fla. Dec. 19, 2008). Accordingly, the agents did not violate the knock-and-announce requirement.

Even if the agents had violated the knock and announce requirement, Cole's argument that the statements and evidence subsequently obtained should be suppressed as a result is without merit, as the Supreme Court has refused to apply the exclusionary rule to knock-and-announce violations. See Hudson, 547 U.S. at 599

("[T]he social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial-incomparably greater than the factors deterring warrantless entries . . . . Resort to the massive remedy of suppressing evidence of guilt is unjustified."); see also United States v. Farias-Gonzalez, 556 F.3d 1181, 1187 (11th Cir. 2009) (citing Hudson, 547 U.S. at 596, 599); United States v. Neth, No. 6:09-cr-210-Orl-19GJK, 2010 WL 1257695, at *9 (M.D. Fla. Mar. 30, 2010) ("Suppression is not a remedy for a violation of the knock-and-announce rule.") (alteration, internal marks, and citation omitted).  While Hudson was decided in the context of a search warrant, the Supreme Court did not expressly limit the holding to the execution of search warrants.  See United States v. Pelletier, 469 F.3d 194, 196 (1st Cir. 2006) (extending Hudson to a knock and announce violation committed in the course of executing an arrest warrant).  The agents here had lawful authority to make a forced entry since Cole never came to the door after a series of knocks.  United States v. Thoussaint, No. 2:09-cr-117-MEF, 2010 WL 447107, at *3 (M.D. Ala. Feb. 4, 2010), adopted at *1 ("[T]he knowledge that the apartment was [defendant's] residence coupled with the reasonable belief that he was inside, but attempting to hide from the officers, validates the entry to execute the arrest warrant.").  Thus, the evidence should not be excluded on this basis.

3.      *The Protective Sweep*

Cole argues that even if the agents lawfully entered the residence to execute the arrest warrant, the agents conducted an unlawful security sweep of the residence because there were no exigent circumstances warranting the sweep and because he was right at the door at the time the agents entered and they immediately took him into custody.  [Doc. 24 at 25].  Cole also contends that even if the agents were justified in conducting a protective sweep of the residence, they exceeded the scope of a lawful protective sweep, which warrants the suppression of any evidence seized from the residence.  [Id. at 25-27].

A warrantless "protective sweep" of a residence upon entering to execute an arrest warrant is allowed in circumstances such as those presented here.  See Maryland v. Buie, 494 U.S. 325, 334 (1990); United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir. 1990) (citing Buie, 494 U.S. at 334); Magluta, 44 F.3d at 1538 (same). "[A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be launched." Buie, 494 U.S. at 334.  "'A protective sweep is a quick and limited search of a premise, incident to an arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a

person might be hiding.'"  United States v. Rigsby, 943 F.2d 631, 637 (6th Cir. 1991) (quoting Buie, 494 U.S. at 327).

Cole's argument that the agents were not faced with exigent circumstances to justify a protective sweep of the residence is without merit.  "[A] protective sweep may be undertaken lawfully pursuant to an in-house arrest where the officer 'possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" United States v. Legette, 260 Fed. App. 247, 249 (11th Cir. 2008) (per curiam) (unpublished) (quoting Buie, 494 U.S. at 337) (internal citations and marks omitted). See also United States v. Caraballo, 595 F.3d 1214, 1224 (11th Cir. 2010). "A protective sweep is essentially a 'frisk' of a residence; it is a limited, minimally invasive, search focused upon ensuring the officers' safety."  United States v. King, No. 08-CR-273, 2009 WL 1393572, at *6 (E.D. Wis. May 19, 2009), adopted at *1.  Under the circumstances of this case, where the agents were at the residence to effectuate an arrest warrant on a fugitive wanted for federal firearms violations, with knowledge of Cole's criminal history and information linking him to an undercover investigation involving the trade of machine guns, and where at least one other individual had been observed leaving the residence Cole had entered, the agents had a reasonable basis to conduct a protective sweep of the residence since Cole had refused to answer

54

the agents' knocks and another individual was present upstairs when the agents gained entry.  United States v. Correa, No. 1:07-cr-00011-MP-AK, 2008 WL 1804309, at *6 (N.D. Fla. Apr. 18, 2008) (finding protective sweep reasonable where defendant had been observed entering the residence where multiple occupants had also been observed).

Cole's argument that a protective sweep was not justified because he was arrested at the front door and immediately taken into custody is also without merit. Indeed, "a protective sweep of a house can be lawful [even] where the arrest occurs outside the house."  United States v. Flores, No. 2:08-cr-108-FtM-29SPC, 2009 WL 55022, at *3 (M.D. Fla. Jan. 7, 2009) (finding protective sweep of residence proper where three defendants were arrested in the driveway of the residence since the officers knew, among other things, that at least one individual posing a danger to the officers effectuating the arrest was inside the residence).  See also United States v. Tobin, 923 F.2d 1506, 1513 (11th Cir. 1991) (en banc).  In fact, "[a] protective sweep of a suspect's house may be made even if the arrest is made near the door but outside the lodging if the arresting officers have reasonable grounds to believe that there are other persons present inside who might present a security risk."  United States v. Watson, 273 F.3d 599, 603 (5th Cir. 2001) (internal marks and citations omitted).

Here, the evidence shows that after the agents entered the residence and placed

55

Cole under arrest, they heard a voice from upstairs yelling, "I'm on the ground" and "I'm up here."  (Tr. at 80, 136-37).  Prior to entering the residence, they had also observed an individual peeking out of the upstairs window, but they were unable to identify whether the individual was male or female.  (Tr. at 79, 97, 109).  Thus, the agents had a reasonable belief based on specific and articulable facts that at least one individual other than Cole was inside the residence and could pose a danger to their safety.  Therefore, the protective sweep was proper.

Cole also argues that the agents exceeded the proper scope of a protective sweep because they did not confine their search to "a cursory inspection of those spaces where a person may be found," Buie, 494 U.S. at 335, but instead searched cabinets and drawers in the bathroom and kitchen, where a person could not be expected to hide. [Doc. 24 at 25-26].  Cole's argument comes down to an assessment of the testimony presented at the evidentiary hearing, and the credible testimony indicates that the agents limited their search to areas where a person could hide.

After the agents entered the residence and heard a female voice yelling from upstairs, the agents fanned out to conduct a protective sweep of the residence.  (Tr. at 80, 82-83, 98).  At this time, approximately five agents proceeded upstairs where they encountered Cotton, who was also holding a baby, and they asked her to stand against the wall.  (Tr. at 99, 137, 148).  The agents continued their sweep of the

56

upstairs. (Tr. at 82). During the sweep, agents observed in plain view a revolver and a semiautomatic pistol on a dresser or nightstand in one of the upstairs bedrooms that was later determined to belong to Cole. (Tr. at 80, 83, 99-100, 109-10, 118, 124). After being informed that these items were observed in plain view, Agent Arrugueta went to the bedroom and removed the ammunition from the firearms and then returned them to the same place they were found. (Tr. at 85, 125). However, the agents did not seize or take possession of the firearms at this time. (Id.). With regard to the sweep, Agent Arrugueta testified that "there was a protective sweep done for people. There was no search. There was nothing opened, lifted, examined. There was nothing else moved. If a body couldn't hide in it, as far as I am aware, nothing was moved, nothing was examined, nothing was searched." (Tr. at 112).

In support of his argument that the agents exceed the scope of a proper protective sweep, Cole relies on Cotton's testimony that during the search upstairs, she could hear the agents opening drawers, bathroom cabinets, and the closet door. (Tr. at 138-39). He further points to her testimony that when she was brought downstairs, she observed agents "[g]oing through kitchen cabinets, opening baby formula, protein shakes and going just walking in and out the room downstairs." (Tr. at 139-40). Cotton's testimony regarding the search upstairs, however, does not refute the credible record evidence that the agents only searched areas where

57

individuals could be located.  She specifically testified that she *heard* drawers and cabinets being opened but she did not actually observe what the agents were doing while conducting the sweep of the upstairs.

Furthermore, while Cotton testified that she observed the agents downstairs opening cabinets and items where individuals could not hide, no evidence was seized from these locations.[32]  In fact, the agents did not seize any evidence during the protective sweep, (Tr. at 85, 122), and even if the search of the cabinets and other items was beyond the scope of the lawful protective sweep, evidence observed in plain view may be lawfully seized if the officer did not violate the Fourth Amendment in "arriving at the place from which the incriminating evidence can be plainly viewed."  United States v. Diaz-Garcia, 808 F. Supp. 784, 789 (S.D. Fla. 1992), adopted at 786.  Here, the agents were lawfully conducting a protective sweep of the upstairs when they observed in plain view the firearms at issue.[33]  Therefore, rather than first obtaining a search warrant, the agents would have been justified in seizing

---

[32] The firearms at issue were observed in plain view on the dresser or nightstand in an upstairs bedroom belonging to Cole, a small amount of marijuana and a piece of plastic was recovered from behind a small desk upstairs, ammunition was observed in a plastic container that was on the kitchen counter, and a pistol holster was observed in a plastic container on the floor of a closet.  (Tr. at 80, 83, 99-100, 109-10, 112, 118, 121-24).

[33] Regardless of who first observed the firearms at issue, the unequivocal testimony is that the items were observed in plain view on the dresser or nightstand area of Cole's bedroom.  (Tr. at 128-29).

the firearms at that time.  See United States v. Ford, 56 F.3d 265, 270 (D.C. Cir. 1995)

(finding agent lawfully seized gun clip observed in plain view and whose

incriminating character was immediately apparent even though search under

mattress or behind window shades exceeded scope of protective sweep); United

States v. Getachew, Criminal No. 3:08-CR-163-D, 2009 WL 211288, at *7-8 (N.D. Tex.

Jan. 29, 2009) (finding evidence observed in plain view during protective sweep

lawfully seized but that handgun found after opening drawer exceeded the scope of

proper protective sweep).  Thus, based on the totality of the circumstances in this

case, the undersigned finds that the items at issue were observed in plain view after

a constitutionally permissible protective sweep.  Accordingly, the "evidence

discovered during the protective sweep was legitimately used to obtain the search

warrant."  United States v. Noriega, Criminal Action No. 09-00240-KD, 2010 WL

348350, at *4 (S.D. Ala. Jan. 22, 2010).

### 4.     *Questioning of Cole*

Agents Arrugueta and Sheppard advised Cole of his Miranda rights after he

was arrested and handcuffed.  (Tr. at 83-85, 114-15).  Both agents testified that Cole

acknowledged his rights, but he refused to talk, so no interview was conducted.  (Tr.

at 85, 115).  However, Agent Arrugueta did ask Cole, for officer safety purposes, if

there was anything in the residence that could hurt the agents, such as guns or

bombs, and Cole replied that there were two guns upstairs.  (Tr. at 116).

Cole first contends that "there was no evidence that Miranda warnings were properly given."  [Doc. 24 at 27].  Specifically, Cole argues that even though "Agent Arrugueta testified that he 'read him his rights from memory,'" that "[t]here was no evidence at the hearing as to what Arrugueta actually told [him]."  [Id. (citing Tr. at 115)].  The evidence, however, shows that the agents clearly advised Cole of his rights under Miranda.  Indeed, Agent Arrugueta testified that he advised Cole of his Miranda rights by reciting them from memory.  (Tr. at 114-15).  While the record is devoid of any evidence regarding the specific content of Agent Arrugueta's warnings,[34] the evidence shows that Agent Sheppard also read Cole his Miranda rights from a standard-issue Miranda card.  (Tr. at 83-84; Gov. Ex. 16).  In fact, Agent Sheppard testified that he advised Cole that he had the right to remain silent and than any statements he made could be used against him in court.  (Gov. Ex. 16).

---

[34] "There are cases in which courts have held that the government failed to meet its burden of proving that adequate *Miranda* warnings were given where the arresting officer failed to testify concerning the specific content of the warnings." United States v. Greenaway, No. 07CR29S, 2008 WL 5691020, at *7-8 (W.D.N.Y. Oct. 23, 2008), adopted in part, No. 07-CR-295, 2009 WL 539907, at *1 (W.D.N.Y. Mar. 4, 2009) (citing Moll v. United States, 413 F.2d 1233, 1238 (5th Cir. 1969)) (citations omitted).  However, "[o]ther courts have held that the lack of such express testimony does not necessarily require suppression." Id. (citing United States v. Muniz, 93 Fed. App. 208, 210-11 (10th Cir. 2004) (unpublished)).  In any event, the Court need not address this issue because the record here is clear that Cole was advised of his Miranda rights.

Additionally, he advised Cole that he had the right to speak to an attorney, to have one present during the questioning, to have one appointed for him if he could not afford one, and, in the event he proceeded with questioning without an attorney, to stop answering questions at any time.  (Id.).  Accordingly, the record demonstrates that Cole was properly advised of his Miranda rights.[35]

Cole also challenges Agent Arrugueta's questioning of him regarding whether there was anything in the residence that could hurt the agents, asserting that Agent Arrugueta interrogated Cole "under the guise that there were some exigency that an agent could get hurt if [he] did not tell them whether there were guns in the residence." [Doc. 24 at 29].  Cole's argument in this regard, however, fails because even if the Court assumes that Agent Arrugueta subjected Cole to a custodial interrogation without first administering Cole his Miranda rights,[36] Agent

[35] Additionally, while Cole argues that he did not validly waive his Miranda rights or "was never asked if he wished to waive these rights," [Doc. 24 at 28], the evidence shows that after he was read his rights, he acknowledged them and then refused to talk so no interview was conducted.  (Tr. at 85, 115).  Therefore, waiver is not in issue in this case.  In fact, the government even states that it "does not contend that Special Agent Arrugueta (or any other agent in the residence at that time) sought the defendant's waiver of his Miranda rights."  [Doc. 25 at 23 n.11].  Accordingly, the Court need not address this argument.

[36] As noted earlier, it is not clear from the testimony at the evidentiary hearing when Agent Arrugueta asked Cole if there was anything in the residence that could hurt the agents, but according to the affidavit Agent Arrugueta used to refresh his memory, (Tr. at 115-16; Gov. Ex. 17), this exchange happened while other agents were conducting the protective sweep of the residence, which would have been

Arrugueta's questions were justified under the public safety exception to <u>Miranda</u>.

"The public safety exception allows officers to question a suspect without first *Mirandizing* him when necessary to protect either themselves or the general public." <u>United States v. Kramer</u>, No. 07-80136-CR, 2008 WL 169615, at *5 (S.D. Fla. Jan. 16, 2008), adopted at *1 (<u>citing</u> <u>New York v. Quarles</u>, 467 U.S. 649, 655-58 (1984)).  <u>See also</u> <u>United States v. Spoerke</u>, 568 F.3d 1236, 1249 (11th Cir. 2009).  That is, "even if [a defendant] was in custody when the officers inquired as to the location of the weapons, his statements were not made in violation of *Miranda*" because the public safety exception allows officers "to question a suspect regarding the location of weapons in order to ensure their safety as well as the safety of others." <u>United States v. Farmer</u>, No. 2:07-cr-50-FtM-34SPC, 2008 WL 2397597, at *3 n.8 (M.D. Fla. June 10, 2008) (citations omitted).  While "it may be argued [that] the gun was in a private residence, and therefore posed no threat to members of the general public[,] the public safety exception extends to concerns for officer safety." <u>United States v. Trinidad</u>, No. 3:06-cr-116-J-32HTS, 2006 WL 1281034, at *3 n.4 (M.D. Fla. May 10, 2006) (internal marks and citation omitted).  Additionally, "[t]he exception does not depend upon the subjective motivation of the questioning officers." <u>United States v. Owens</u>, No. 5:09-cr-14/RS, 2009 WL 2584570, at *4 (N.D. Fla. Aug. 20, 2009).  Here,

---

before Agent Sheppard read Cole his <u>Miranda</u> rights.

"the limited questioning concerning the presence of a weapon was not investigatory in nature, but rather, was for the purpose of protecting the officers' safety." <u>Diaz-Garcia</u>, 808 F. Supp. at 788. Thus, under the circumstances of this case, Agent Arrugueta's questions regarding the presence of weapons was lawful and Cole's statements in response are not due to be suppressed.[37] <u>United States v. Smith</u>, 322 Fed. App. 876, 878 (11th Cir. 2009) (*per curiam*) (unpublished).

**5.     *Challenge to the Search Warrant***

Finally, Cole argues that the affidavit in support of the search warrant for the residence included material misrepresentations and omissions in violation of <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), that warrant the suppression of evidence. [Doc. 24 at 31].[38] Specifically, Cole argues that the affidavit failed to state that his prior

---

[37] Cole also argues that his statements "were obtained under unduly coercive circumstances and/or duress" since he was "taken down at his front door by a line of armed swat team officers, forced to get down on the ground, and handcuffed." [Doc. 24 at 30]. The fact that Cole declined to speak with the agents after being advised of his <u>Miranda</u> rights, however, shows that he did not feel coerced to make certain statements. <u>See</u> <u>United States v. Broome</u>, No. 1:05-CR-135-WSD, 2006 WL 508054, at *6 (N.D. Ga. Feb. 28, 2006). Therefore, the Court finds this argument to be without merit.

[38] Cole also argues that evidence seized from his residence as a result of the search warrant must be suppressed because it was the fruit of his illegal stop on May 6, 2009, and the illegal entry and sweep of the residence on December 16, 2009. [Doc. 24 at 31-32]. Having already found that the officers acted lawfully when they stopped Cole on May 6 and when they entered Cole's residence and conducted a protective sweep on December 16, his fruit of the poisonous tree argument fails.

criminal conviction was from 2000 and did not involve a firearm although it was for the criminal possession of a weapon in the 3rd degree.  [Id. at 31].  He further argues that the "affidavit alleges that he waived his rights and stated there were firearms upstairs" even though he invoked his right to remain silent.  [Id.].

A presumption of validity attaches to an affidavit supporting a search warrant application.  Franks, 438 U.S. at 171.  "Under *Franks*, a defendant may attack a facially sufficient affidavit supporting a search warrant if (1) it contains statements or omissions that were deliberately false or demonstrated a reckless disregard for the truth and (2) those challenged statements or omissions are essential to the magistrate judge's finding of probable cause."  United States v. Bell, No. 2:09CR00021, 2010 WL 841308, at *2 (W.D. Va. Mar. 11, 2010) (citations omitted).  See also United States v. Maharaj, No. 07-80024-CR-CR, 2007 WL 2254559, at *6 (S.D. Fla. Aug. 2, 2007), adopted at *1; United States v. Burston, 159 F.3d 1328, 1333 (11th Cir. 1998).  "'The *Franks* standard is a high one.'"  United States v. Nakouzi, No. 3:05CR154(MRK), 2005 WL 3211208, at *5 (D. Conn. Nov. 30, 2005) (quoting Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991)).

Negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights.  See Maughon v. Bibb County, 160 F.3d 658, 660 (11th Cir. 1998) (*per curiam*); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th

64

Cir. 1997); Franks, 438 U.S. at 171.  Moreover, "'[i]nsignificant and immaterial misrepresentations or omissions will not invalidate a warrant.'"  Maharaj, 2007 WL 2254559, at *7 (quoting United States v. Ofshe, 817 F.2d 1508, 1513 (11th Cir. 1987)).  Indeed, every fact recited in an affidavit in support of an application for a search warrant does not necessarily have to be correct, but the affidavit must be truthful in the sense that it is believed or appropriately accepted by the affiant as true.  Franks, 438 U.S. at 165.

Cole also bears the burden of showing that absent the alleged misrepresentations or omissions, probable cause would have been lacking.  United States v. Umole, 162 Fed. App. 948, 950 (11th Cir. 2006) (per curiam) (unpublished) (quoting United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001); Maharaj, 2007 WL 2254559, at *6 (citing Novaton, 271 F.3d at 987).  Upon such proof by Cole, the Court must suppress the items seized pursuant to the defective search warrant.  See United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987) (per curiam); United States v. Kirk, 781 F.2d 1498, 1502 (11th Cir. 1986).  However, "if the court is satisfied that when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, then no hearing is required."  Nakouzi, 2005 WL 3211208, at *5 (internal citation and marks omitted).

Cole has not met the strict standard under <u>Franks</u>.  That is, Cole has not made a substantial preliminary showing that the agent knowingly and intentionally made a false statement in the affidavit.  Additionally, even if the Court disregards those portions of the affidavit that Cole contends are misleading, "there remains sufficient content in the warrant affidavit to support a finding of probable cause."  <u>United States v. Kapordelis</u>, 569 F.3d 1291, 1309 (11th Cir. 2009).  Thus, evidence obtained as a result of the execution of the search warrant at Cole's residence is not due to be suppressed.

## III.  CONCLUSION

For the foregoing reasons and cited authority, the undersigned Magistrate Judge **RECOMMENDS** that Cole's motions to suppress evidence and statements, [Docs. 12 & 14], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 12th day of May, 2010.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

66