FILED IN CHAMBER
U.S.D.C. - Atlanta

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AUG 1 1 2010

By: James N. Hatten, Clerk
    a·m·carue
    Deputy Clerk

UNITED STATES OF AMERICA

CRIMINAL CASE NO.

v.

1:09-CR-0412-ODE-RGV

KIRVAN COLE

## ORDER

This criminal case comes before the Court on objections [Doc. 32] filed by Defendant Kirvan Cole ("Defendant") to a Report and Recommendation ("R&R") entered on May 12, 2010, by United States Magistrate Judge Russell G. Vineyard [Doc. 27]. Magistrate Judge Vineyard recommended that this Court deny Defendant's motions to suppress evidence and statements [Docs. 12 & 14] and certified this case ready for trial [Doc. 27 at 68].

For the following reasons, Defendant's objections to the R&R [Doc. 32] are OVERRULED, and the R&R [Doc. 27] is ADOPTED. As a result, the motions to suppress [Docs. 12 & 14] are DENIED in their entirety.

I.    Factual and Procedural Background[1]

At approximately 2:00 a.m. on May 6, 2009, seven Henry County Police Department ("HCPD") officers, acting at the direction and under the supervision of HCPD Sergeant Jennifer Savage ("Sergeant Savage"), set up a roadblock on the Eagles Landing Parkway bridge

_____

[1] Magistrate Judge Vineyard held an evidentiary hearing on the instant motions on February 9, 2010. The Court constructs this background from the facts found by Magistrate Judge Vineyard in the R&R, noting and addressing any objections asserted by Defendant to those facts as the Court proceeds.

over Interstate 75 in Stockbridge, Georgia, to conduct sobriety checks and driver's license and vehicle registration examinations. The officers identified the roadblock with marked police vehicles, "blue lights," and uniformed police officers wearing reflective vests and directing traffic with flashlights. The officers stopped all vehicles that approached the roadblock,[2] and the average vehicle stop lasted from thirty seconds to one minute, unless an officer noticed, in Sergeant Savage's words, "somebody appearing to be under the influence of alcohol or something of that nature," in which case officers would investigate further.[3]

Around 3:00 a.m., an individual later identified as Defendant approached the roadblock driving a black BMW sport utility vehicle. HCPD Officer Wesley McNure ("Officer McNure") stopped the vehicle, introduced himself, and asked for Defendant's driver's license. While Defendant handed Officer McNure his driver's license, Officer McNure shone his flashlight into the vehicle and

---

[2] Defendant objects to the "finding that vehicles in both directions were being stopped" by the officers conducting the roadblock, arguing that "there was no testimony that . . . officers were stopping cars on the eastbound side of the [overpass] bridge" [Doc. 32 at 3]. The Court agrees that no evidence adduced at the suppression hearing indicated that any HCPD officers conducting the roadblock stopped any cars headed eastbound on Eagles Landing Parkway and SUSTAINS Defendant's objection to any factual finding made by Magistrate Judge Vineyard to the contrary. Sustaining this objection, however, does not impact the Court's ultimate determination regarding the roadblock's validity, which the Court discusses in detail below.

[3] The roadblock lasted until around 4:00 a.m. As a result of the roadblock, HCPD officers made "two or three" arrests for driving under the influence and at least one arrest for driving on a suspended driver's license.

2

saw "a small bag, a sandwich baggy" containing what appeared to be less than one ounce of marijuana [4] and a loaded "handgun clip or magazine" in the center console area [Tr. at 23-24, 45-46]. Officer McNure rhetorically asked, "What is that?", but Defendant did not answer, instead looking up at the ceiling of the vehicle. Officer McNure then instructed Defendant to hand him the bag, which Defendant did. Officer McNure then asked Defendant to pull the vehicle to the side of the road, which Defendant also did.

Once Defendant pulled over, Officer McNure approached the vehicle and asked Defendant to get out and walk to the rear of the vehicle, which Defendant did. Officer McNure then asked Defendant "about the marijuana" and whether "he cared to explain it." Defendant responded that the marijuana was his, that it was just for recreational use, and asked Officer McNure "just to let him slide on it."[5] Without responding to this request, Officer McNure

---

[4] Defendant objects to the finding in the R&R "that [Officer] McNure was specifically qualified and trained to detect and determine whether a substance was marijuana or on drug identification" [Doc. 32 at 7]. Officer McNure's testimony was that he had made an arrest earlier that evening for possessing less than an ounce of marijuana [Tr. at 22, 46-47]. He did not say that he had received any specialized training in recognizing or identifying illegal narcotics. However, this does not affect the Court's ultimate determination regarding the validity of Officer McNure's actions during the May 6 roadblock, discussed below.

[5] Defendant objects to Magistrate Judge Vineyard "fail[ing] to find [in the R&R] that these alleged statements were not in Officer McNure's [police] report" of the May 6 incident [Doc. 32 at 10]. Because Officer McNure did not include the statements in his written report, Defendant argues that Magistrate Judge Vineyard "should not have made a finding that Defendant" made the statements at all [Doc. 32 at 10]. But the omission of the

asked Defendant who owned the handgun clip that he had seen on the vehicle's center console and whether there were any weapons in the vehicle. Defendant told Officer McNure that the handgun clip belonged to a friend of his that had been in the vehicle earlier and that there were no weapons anywhere in the vehicle.

At that point, Officer McNure advised Defendant that he was placing him under arrest for possession of marijuana and directed him to turn around and place his hands behind his back. Defendant turned around, but as Officer McNure reached to put a handcuff on Defendant's left wrist, Defendant snatched his wrist forward and bolted back toward the vehicle's driver's seat. The vehicle's driver's-side door had been left open, and Defendant jumped into the driver's seat. Officer McNure grabbed Defendant's left arm in an attempt to pull him back out of the vehicle. During the ensuing struggle, Officer McNure noticed Defendant extending his right hand away from him and toward the vehicle's center console area.

---

statements from Officer McNure's report did not prohibit Magistrate Judge Vineyard from treating as credible, and accepting as fact, Officer McNure's testimony that Defendant made the statements. Officer McNure's omission merely counterbalanced, to some extent, his testimony regarding the statements. Magistrate Judge Vineyard had the opportunity to consider Officer McNure's testimony on this point and weigh his credibility in light of the omission of the statements from Officer McNure's police report. Clearly, Magistrate Judge Vineyard accorded the testimony significant weight. Defendant presents no reason, outside of the omission, for this Court to second-guess Magistrate Judge Vineyard's credibility determination. Thus, the Court OVERRULES Defendant's objection to Magistrate Judge Vineyard's factual finding regarding the statements that Defendant made outside the pulled-over sport utility vehicle on May 6.

Concerned that Defendant was attempting to reach a weapon, Officer McNure lunged into the vehicle and wrapped his right arm around Defendant's head in an attempt to gain leverage and pull Defendant back out of the vehicle. Another HCPD officer eventually came to Officer McNure's aid; both of the officers and Defendant subsequently fell out of the vehicle and onto the ground. Defendant continued to struggle with the officers, but eventually they placed handcuffs on him, patted him down, and placed him in the back seat of Officer McNure's patrol vehicle.

With Defendant under arrest and secured in the patrol vehicle, Officer McNure and HCPD Lieutenant James Gray searched the BMW sport utility vehicle. As Officer McNure opened the vehicle's doors, he smelled what he believed to be a strong odor of raw marijuana coming from the interior. The officers then searched the vehicle's entire passenger compartment, locating a small, two-round gun in the center console area between the front seats, a Keltec pistol in the passenger seat behind the driver's seat, two handguns in a shopping bag on the floorboard behind the driver's seat, $54,286.61 in cash in a shoe box located in another shopping bag on the floorboard behind the driver's seat, and various cellular telephones. The officers seized all of these items and placed them in the trunk of an officer's patrol vehicle, while Officer McNure kept custody of the bag of marijuana initially located on the vehicle's center console.

After the officers concluded their search, they impounded the BMW sport utility vehicle pursuant to HCPD policy, and a private company towed the vehicle from the scene of the roadblock. The

officers then transported Defendant to HCPD headquarters and placed him in an interview room there.

Sometime after the officers returned to HCPD headquarters with Defendant and the seized evidence, they placed the cash seized from the sport utility vehicle into three brown paper bags, which they then lined up alongside three empty brown paper bags. HCPD officers then ordered and monitored a canine sniff procedure of all six bags. Officer McNure observed the canine direct his attention to the brown paper bags that contained the seized cash.

Around 6:30 a.m., HCPD Drug Enforcement Administration Task Force Special Agent Jason Allen ("Agent Allen") arrived at HCPD headquarters to interview Defendant in an effort to determine whether the "large money seizure" could be adopted for purposes of a federal prosecution. Agent Allen entered the interview room where HCPD officers had placed Defendant, introduced himself, and, in the presence of another officer, advised Defendant of his rights as prescribed by Miranda v. Arizona, 384 U.S. 436 (1966), by reading them directly from DEA Form 13-A. Specifically, Agent Allen advised Defendant of his right to remain silent, that any statements that he made could be used against him in court, and that he had the right to speak to an attorney, to have one present during questioning, and to have one appointed for him if he could not afford one. After reading Defendant these rights, Agent Allen asked Defendant if he would mind answering some questions. Defendant said that he would speak to him.

Agent Allen's interrogation of Defendant lasted approximately ten to fifteen minutes. During the interview, Agent Allen asked Defendant about the large amount of cash seized from the BMW sport

6

utility vehicle. Defendant responded that he owned a music label in Clayton County, Georgia, and that the money belonged to the label's investors. Once Agent Allen began asking more questions about the label, Defendant indicated that he wanted to speak with his attorney. Agent Allen thus immediately ended the interview.

At some point after Agent Allen arrived at HCPD headquarters, he searched Defendant's Motorola cell phone, which HCPD officers had seized from the sport utility vehicle following Defendant's arrest. Specifically, Agent Allen recalled searching through the recent calls and contacts stored on the cell phone. Agent Allen did not have a search warrant or Defendant's consent to search the cell phone when he conducted this search.[6]

On September 22, 2009, a federal grand jury sitting in the Northern District of Georgia returned a one-count indictment against Defendant, charging him with being a felon in possession of the four firearms found in the BMW sport utility vehicle at the May 6 roadblock [Doc. 1].[7] An arrest warrant was issued for Defendant on or about October 22, 2009.[8]

---

[6] Defendant's motion to suppress does not identify what information was gleaned from the cell phone which is sought to be suppressed.

[7] Another federal grand jury sitting in the Northern District of Georgia superseded this indictment on May 26, 2010 [Doc. 34]. That grand jury indicted Defendant on one count of possessing, while a convicted felon, the four firearms found in the BMW sport utility vehicle at the roadblock, and one count of possessing, while a convicted felon, two additional firearms seized on December 16, 2009, as described in detail below [Doc. 34 at 1-2].

[8] The R&R does not state the circumstances of Defendant's release on or about May 6.

7

On October 23, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Joel Sheppard ("Agent Sheppard") began attempts to locate and apprehend Defendant. At some point between October and the beginning of November, Agent Sheppard conducted a database search to obtain information about Defendant's residence and location. Agent Sheppard eventually discovered[9] Defendant's connection to a residence located at 1228 Ithaca Drive in McDonough, Georgia. Agent Sheppard later received information from a postal inspector that Defendant and an individual named Keith Cole had been receiving mail at the 1228 Ithaca Drive address. During his investigation into Defendant's whereabouts, Agent Sheppard also obtained a copy of the driver's license and a photograph of Minita Tanner ("Tanner"), whom Agent Sheppard discerned to be Defendant's girlfriend.[10]

---

[9] Defendant objects to a finding purportedly made in the R&R "that implies Agent Sheppard conducted multiple searches to find . . . Defendant or that it was difficult [to locate] him" [Doc. 32 at 24]. First, the Court notes that the R&R only refers to "a database search" regarding Defendant's whereabouts, rather than "multiple searches." Additionally, the Court does not read the R&R's mention of Agent Sheppard "eventually discover[ing]" Defendant's connection to the 1228 Ithaca Drive residence as implying "that it was difficult" to locate Defendant. Nowhere in the R&R did Magistrate Judge Vineyard expressly find that Agent Sheppard had difficulty finding information about Defendant (or finding Defendant himself). The Court OVERRULES Defendant's objection to any such factual finding purportedly made in the R&R, which stems more from Defendant's reading of the R&R than any facts expressly found by Magistrate Judge Vineyard.

[10] Defendant objects "to the R&R omitting the fact that law enforcement knew [that] . . . Tanner did not have any criminal history" [Doc. 32 at 25]. This omission is unsurprising, however, because the fact of Tanner's criminal history (and whether law

Around December 6, 2009, an unnamed HCPD officer conducted surveillance of the 1228 Ithaca Drive residence and observed the BMW sport utility vehicle that Defendant had been driving on May 6 leave the residence. At that time, however, the officer could not identify the driver of the vehicle. Around December 14, Agent Sheppard conducted additional surveillance of the 1228 Ithaca Drive residence himself, but "didn't see any activity at all."

Around noon on December 16, 2009, Agent Sheppard returned to conduct further surveillance of the 1228 Ithaca Drive residence. About an hour later, Agent Sheppard saw the BMW sport utility vehicle pull into the residence's driveway and identified the vehicle's driver as Defendant. Agent Sheppard then saw Tanner exit the residence and converse with Defendant in the driveway for two to three minutes. After the conversation ended and Tanner reentered the residence, Agent Sheppard saw Defendant pull the vehicle into the garage, park it, get out, and enter the residence. Immediately thereafter, Agent Sheppard observed Tanner leave the residence in a white Mercedes-Benz.

Agent Sheppard then called for backup so that he could assemble an arrest team, and another agent soon relieved him of surveillance duty. Agent Sheppard also contacted HCPD, requesting that they position officers near the residence to conduct a traffic stop should Defendant leave the residence before Agent Sheppard's arrest team could execute the arrest warrant.

---

enforcement knew of it or not) is entirely irrelevant. Defendant does not challenge the means by which Agent Sheppard obtained a copy of Tanner's driver's license or her photograph. The Court OVERRULES Defendant's objection to this omission from the R&R.

Agent Sheppard went to a "staging area" to prepare to execute the arrest warrant. There, he advised other agents about Defendant's physical size, his criminal history, the nature of the charge against him, the type of vehicle that he had been seen driving, and that he had previously fought with police officers and might have an association with machine guns.[11] Agent Sheppard also showed the other agents Defendant's photograph.

Following this briefing, the arrest team proceeded to the 1228 Ithaca Drive residence. At least four agents made up the "perimeter team" that surrounded the residence. Approximately eight to ten agents made up the "entry team" that approached the

---

[11] Agent Sheppard learned some of this information from Special Agent Daniel Arrugueta ("Agent Arrugueta")—namely, that Defendant had a criminal history involving firearms and assault rifles, that he had been convicted in New York in 2000 for criminal possession of a weapon in the third degree, that firearms were found in his vehicle following his May 6 arrest in Henry County, and that he was suspected in a deal "to provide machine guns to a special agent." Defendant objects to the purported finding in the R&R "that agents received information that [Defendant] 'had a criminal history that involved firearms and assault rifles,'" arguing that his 2000 conviction for possession of a weapon in the third degree did not involve a firearm [Doc. 32 at 25]. This proposition, even if taken as true, does not refute the fact found in the R&R that Agent Arrugueta relayed to Agent Sheppard that Defendant had a criminal history involving firearms, whether that information was correct or not. Put simply, Defendant refutes Agent Arrugueta's characterization of the factual basis for his 2000 conviction, rather than the fact of Agent Arrugueta relaying that (arguably erroneous) information to Agent Sheppard. The R&R found the latter fact, rather than anything related to the former. The Court OVERRULES Defendant's objection to the purported finding in the R&R that Defendant had a criminal history involving firearms—which is not an actual finding that Magistrate Judge Vineyard made anywhere in the R&R.

residence's front door in a single-file line more commonly referred to as a "stack."

Agent Sheppard knocked on the front door of the residence and announced the agents' presence; no one answered. After this knock-and-announce, Agent Sheppard noticed someone peeking through the blinds of an upstairs window, but could not identify, at that time, the individual or their gender. Agent Sheppard knocked on the front door two more times and, after waiting for thirty to forty-five seconds, he and the other agents forcibly entered the residence by breaching the front door.

Upon entering the residence, the agents first encountered Defendant, who was coming down the front stairs. Defendant continued to the bottom of the stairs and identified himself to the agents, who ordered him to get onto the ground, patted him down in an attempt to locate any weapons or readily-identifiable contraband, handcuffed him, and placed him under arrest.

The agents then heard a female yelling "I'm on the ground" and "I'm up here" from upstairs. The female was Janae Cotton ("Cotton"),[12] Tanner's 18-year-old cousin, who was upstairs holding

---

[12] At the suppression hearing, Cotton testified that she had peered out of the upstairs window when she heard what sounded like brakes of a car. Cotton testified that, looking out the window, she could see ten to fifteen unmarked cars. Cotton testified that she yelled to Defendant, who was playing loud music on his computer, that there were cars in the front yard. According to Cotton, Defendant went to the laundry room, put on sweatpants, and proceeded down the stairs, where he encountered the agents.

Defendant objects to the R&R "finding that . . . Cotton's testimony did not contradict . . . the agents' testimony [that] they had earlier knocked and announced their presence" [Doc. 32 at 27]. At the hearing, Cotton testified that she heard two knocks,

Defendant and Tanner's 12-month-old baby, Kelsey, when the agents entered. Cotton advised the agents that there was a baby upstairs.

The agents then fanned out in order to conduct a protective sweep of the residence.[13] As part of that sweep, approximately five agents proceeded upstairs, where they encountered Cotton, still holding Kelsey. The agents asked Cotton to stand against the wall. Meanwhile, the agents continued their sweep of the upstairs, searching areas "where someone [could] hide."[14] During the sweep

---

immediately after which the agents entered the residence through the front door. Based on this testimony, Magistrate Judge Vineyard concluded that "the credible evidence from the suppression hearing demonstrate[d] that the agents did knock and announce" their presence before entering the residence [Doc. 27 at 53]. The only contradiction introduced by Cotton's testimony concerns Agent Sheppard's first knock on the front door, which Cotton never testified to having heard. Even recognizing this contradiction would not overcome the finding in the R&R that the agents knocked at least twice before entering the residence. For that reason, the Court OVERRULES Defendant's objection to Magistrate Judge Vineyard's failure to recognize, in the R&R, an ultimately immaterial contradiction introduced by Cotton's testimony.

[13] Agent Sheppard testified that, for officer safety reasons, "[w]hen [agents would] go into a house, [they would] search for . . . the fugitive and anywhere in the outlying area where there might be anybody hidden or that can come out and hurt [them]."

[14] While the protective sweep was underway, Agent Arrugueta advised Defendant of his Miranda rights by reciting them from memory. Defendant objects to this finding in the R&R, claiming that "[t]here was no evidence at the [suppression] hearing as to what [Agent] Arrugueta actually told" him [Doc. 32 at 31]. The Court agrees, noting that Agent Arrugueta did not testify as to what he actually told Defendant when he advised him of his rights. But Agent Arrugueta did testify that he advised him of his Miranda rights from memory and that he had been doing so, without a Miranda rights card to assist him, for ten of the twenty-four

12

of the upstairs, agents observed a revolver and a semiautomatic pistol on a nightstand in what law enforcement later determined to be Defendant's bedroom.[15] The agents did not seize or take

---

years he had been advising suspects of their rights. Magistrate Judge Vineyard concluded that this testimony sufficed to find that Agent Arrugueta sufficiently advised Defendant of his    Miranda rights on December 16, notwithstanding the Government's failure to go through the rights that Agent Arrugueta actually told Defendant. The Court concludes that Agent Arrugueta's testimony warranted Magistrate Judge Vineyard's finding on this point. Defendant's objection to this factual finding is OVERRULED.

After Agent Arrugueta informed him of his rights, Defendant acknowledged them but did not make any statements. However, Agent Arrugueta asked Defendant: "For officer safety purposes, is there anything in the residence that could hurt an agent? Are there any guns? Are there any bombs? Is there anything that could hurt anybody?" Immediately thereafter, Defendant told Agent Arrugueta that there were two guns upstairs.

[15] Defendant objects to this finding in the R&R, arguing that "Agent Arrugueta testified that because he was not the initial person to see the firearms during the sweep, he did not have personal knowledge of where and how the guns were initially found" by other agents conducting the sweep [Doc. 32 at 29]. As a result, Defendant argues that Magistrate Judge Vineyard "should have found that there was no evidence that firearms were initially found by an officer in plain view" [Doc. 32 at 29]. However, Agent Arrugueta testified that the agents who preceded him in conducting the protective sweep of Defendant's bedroom notified him that they located the two firearms on the nightstand in plain view, and that he had no reason to doubt these remarks. On these grounds, Magistrate Judge Vineyard concluded that, "[r]egardless of who first observed the firearms at issue, the unequivocal testimony [was] that the items were observed in plain view on the . . . nightstand area of [Defendant's] bedroom" [Doc. 27 at 60 n.33]. The record, and especially Agent Arrugueta's testimony about the other agents' statements to him, supports this conclusion. The Court OVERRULES Defendant's objection to the factual finding in the R&R that the two firearms in Defendant's bedroom were in plain view of the agents conducting the protective sweep.

possession of either of these firearms at the time, but Agent Arrugueta removed the ammunition from the firearms and then returned them to the location where they were initially seen. The agents also saw a small amount of marijuana and a piece of plastic behind a small desk in an upstairs loft area. Also, during the protective sweep, agents saw ammunition for a .32-caliber pistol in a plastic container and a Georgia Natural Gas bill bearing Defendant's name on the kitchen counter, as well as a pistol holster in a plastic container on the floor of a closet.

After the agents determined that the only people in the residence were Defendant, Cotton, and Kelsey, the agents concluded the protective sweep, which lasted two to four minutes.[16]

---

[16] Cotton gave materially different testimony about the agents' protective sweep than the facts found in the R&R. For instance, Cotton testified that, after the agents came upstairs, she stood with them for twenty minutes while the sweep continued before they escorted her downstairs. During that time, Cotton testified that she heard, but did not personally observe, the agents upstairs going through drawers and bathroom cabinets. After being escorted downstairs, Cotton testified that she sat at a dining room table, as directed by the agents, for "a good hour," and that during that time the agents downstairs went through kitchen cabinets and opened containers of baby formula and protein shakes. Cotton testified that the agents permitted her to leave the residence two hours after their initial entry.

In contrast, Agent Arrugueta testified that the agents conducted "a protective sweep . . . for people. There was no search. There was nothing opened, lifted, examined. There was nothing else moved. If a body couldn't hide in it, as far as [he was] aware[,] nothing was moved, nothing was examined, nothing was searched." Magistrate Judge Vineyard gave more weight to Agent Arrugueta's testimony about the scope and nature of the protective sweep than Cotton's contradictory testimony. Defendant presents the Court with no reason to question that credibility determination, aside from objecting generally to Magistrate Judge

14

After the protective sweep, Agent Sheppard read Defendant his Miranda rights from a standard-issue Miranda card. Agent Sheppard advised Defendant that he had the right to remain silent, that any statements could be used against him in court, and that he had the right to speak to an attorney, to have one present during any questioning, to have an attorney appointed for him if he could not afford one, and to stop answering questions at any time (if he chose to proceed with questioning without an attorney). Defendant acknowledged his rights after Agent Sheppard read them to him, but did not make any statements at the time.

With Defendant in custody, Agent Arrugueta prepared an affidavit and application for a search warrant for the property located at 1228 Ithaca Drive, which ATF Special Agent Allan Lamar McLeod, III ("Agent McLeod") signed and presented to United States Magistrate Judge Gerrilyn G. Brill. In the affidavit supporting the warrant application, Agent Arrugueta relayed, among other things, the facts related to Defendant's May 6 arrest by the HCPD, the December surveillance and December 16 entry of the 1228 Ithaca Drive residence, and the agents' protective sweep of that property. Specifically, Agent Arrugueta stated:

> [Defendant] was taken into custody near the front door, and agents proceeded to clear the residence to ensure there were no other threats present. In an upstairs master

---

Vineyard accepting Agent Arrugueta's testimony and not Cotton's testimony to the contrary. Without more, the Court defers to Magistrate Judge Vineyard's weighing of the competing testimony, given his opportunity to consider that testimony firsthand at the suppression hearing. The Court OVERRULES Defendant's objection to the factual findings in the R&R regarding the nature and extent of the protective sweep.

> bedroom,   agents   observed   two   (2)
> firearms. . . . Both firearms were lying on
> top of a nightstand with what appeared to be
> a man's wallet lying on top of them. . . .
>
> As agents cleared the house, they observed in
> plain view: the firearms detailed above, a
> Georgia   Natural   Gas   bill   addressed   to
> [Defendant], 1228 Ithaca Drive, McDonough,
> Georgia, a knotted, torn plastic baggy on an
> upstairs handrail (consistent with what is
> used   to   store   small   amounts   of   illegal
> drugs), another torn plastic baggy behind a
> computer table containing dried, green leafy
> material   and   seeds   consistent   with   the
> appearance of marijuana, four rounds of .32
> caliber   ammunition   in   a   plastic   container
> that originally contained fifty (50) rounds,
> and a pistol holster in the floor of a closet
> in a child's bedroom.

Magistrate Judge Brill signed the search warrant, and the agents

seized various items from 1228 Ithaca Drive residence pursuant to

the authorization provided by the warrant.

On January 5 and 21, 2010, Defendant filed his motions to

suppress evidence and statements derived from the May 6 and

December 16 incidents with HCPD officers and federal agents [Docs.

12 & 14]. Magistrate Judge Vineyard took the motions under

advisement after the suppression hearing held on February 9 [Doc.

18 at 1]. The Government filed its response to Defendant's motions

on March 16 [Doc. 22]; Defendant filed his supplemental brief in

support of his motions on March 30 [Doc. 24]; the Government

responded to that brief on April 13 [Doc. 25].

Magistrate Judge Vineyard issued the R&R recommending that

this Court deny Defendant's motions in their entirety, and

certifying the case ready for trial, on May 12 [Doc. 27].

Defendant timely filed his objections to the R&R on May 27 [Doc.

32]. The case has since been set down for trial to begin on September 27, 2010, before the undersigned [Doc. 43 at 1].

## II.  Discussion

### A.  Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), the Court must conduct a de novo review of those portions of the R&R to which Defendant timely and specifically objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by Magistrate Judge Vineyard. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); United States v. Raddatz, 447 U.S. 667, 673-74 (1980). The Court deems Defendant to have waived his right to request review of any portions of the R&R to which he failed to timely and specifically object. Fed. R. Crim. P. 59(b)(2).

### B.  Defendant's Specific Objections

#### 1.  The Legality of the May 6 Roadblock

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. See also Case v. Eslinger , 555 F.3d 1317, 1326 (11th Cir. 2009) ("'Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures."'") (quoting Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007)). A "search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." United States v. Regan, 218 F. App'x 902, 903 (11th Cir. 2007) (per curiam) (citing Chandler v. Miller, 520 U.S. 305, 308 (1997)).

17

The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted). Or, pertinent to this case, "[v]ehicle stops at roadway checkpoints constitute a seizure within the meaning of the Fourth Amendment." United States v. Smith, 694 F. Supp. 2d 1242, 1254 (M.D. Ala. 2009) (citing City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000)). See also Brower v. County of Inyo, 489 U.S. 593, 598-99 (1989) (roadblock crossing both lanes of traffic that stops drivers constitutes a "seizure" for Fourth Amendment purposes).

"The Fourth Amendment test 'is reasonableness in light of all the circumstances.'" Smith, 694 F. Supp. 2d at 1254 (quoting United States v. Prevo, 435 F.3d 1343, 1345 (11th Cir. 2006)). "Consideration of the constitutionality of [suspicionless] seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Regan, 218 F. App'x at 903 (citing Brown v. Texas, 443 U.S. 47, 50-51 (1979)). "Even if the government has the authority to conduct a checkpoint, the reasonableness inquiry under the Fourth Amendment requires a determination of whether the intrusion on an individual's privacy was warranted in light of the state's interest." Id. at 904 (citing Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 453-53 (1990)).

18

a.    Identification of the May 6 Roadblock

Defendant challenges the roadblock established by HCPD officers on May 6, 2009, on three grounds. First, Defendant argues that the officers did not comply with the HCPD's policy manual, which listed several specific procedures for establishing and identifying roadblocks and safety checkpoints and commanded that those procedures "be followed without deviation in their entirety." Defendant argues that, "without any signs, traffic cones, or flares, the road block was not well identified as a police checkpoint, and law enforcement failed to implement their procedures 'without deviation in their entirety,'" rendering the May 6 roadblock constitutionally deficient [Doc. 32 at 2].

> A roadblock in Georgia is valid when it meets five requirements: (1) supervisory officers decided where and when to implement it for a legitimate purpose; (2) all vehicles were stopped; (3) the delay to motorists was minimal; (4) the operation was well-identified as a police checkpoint; and (5) the screening officer was competent to determine which motorists should be given field tests for intoxication.

Coursey v. State, 672 S.E.2d 456, 477 (Ga. Ct. App. 2009) (citing Baker v. State, 556 S.E.2d 892, 900 (Ga. Ct. App. 2001)).

Defendant's first argument—that the May 6 roadblock fell below constitutional standards because HCPD officers failed to employ all of the enumerated means of identifying roadblocks "without deviation in their entirety," as commanded by HCPD policy—fails. As Coursey makes clear, a roadblock established and operated by law enforcement in Georgia need only be well-identified as a police checkpoint, among other requirements, to

19

satisfy the Fourth Amendment. Officers' adherence to internal policies, even when such policies demand to-the-letter conformity, bears no relevance in assessing, based on the totality of the circumstances, whether a roadblock was, in fact, well-identified by law enforcement as a police checkpoint.

Upon de novo review, the Court concludes that the May 6 roadblock was well-identified as a police checkpoint, despite HCPD officers' failure to strictly conform to the standards set by HCPD policy for identifying such checkpoints. Testimony at the suppression hearing showed that HCPD officers used marked police vehicles, "blue lights," and uniformed police officers wearing reflective vests and directing traffic with flashlights to identify the May 6 roadblock. Even if HCPD officers could have done more to identify the May 6 roadblock, or were commanded to do more by internal HCPD policy, what they actually did to identify the May 6 roadblock to oncoming drivers sufficed. [17] Despite Defendant's contentions to the contrary, the Court concludes that

---

[17]    See generally Sutton v. State, 678 S.E.2d 564 (Ga. Ct. App. 2009) (roadblock well-identified where officers used twelve to thirteen police vehicles, with blue lights on, at checkpoint intersection); Laquines v. State, 656 S.E.2d 237 (Ga. Ct. App. 2008) (roadblock well-identified where officers used two patrol vehicles, with blue lights on, and deputies wearing traffic vests and directing oncoming vehicles with flashlights, to identify the checkpoint); Baker v. State, 650 S.E.2d 786, 787-88 (Ga. Ct. App. 2007) (roadblock "clearly identified" where law enforcement used "police cars with flashing blue emergency lights and uniformed officers wearing reflective vests and holding flashlights" to identify the checkpoint); Cater v. State, 635 S.E.2d 246 (Ga. Ct. App. 2006) (roadblock well-identified where uniformed officers, some wearing luminescent vests, and five or six marked patrol cars with lights flashing used to identify the checkpoint).

20

the means used by HCPD officers to identify the May 6 roadblock made it "highly unlikely that a motorist would have taken the activity to be anything other than a police checkpoint." Perdue v. State, 578 S.E.2d 456, 460 (Ga. Ct. App. 2002). The Court thus OVERRULES Defendant's objection to the conclusion in the R&R that HCPD officers sufficiently identified the May 6 roadblock.

b.   Purposes of the May 6 Roadblock

Defendant next challenges the purposes for which HCPD officers established and conducted the May 6 roadblock, arguing that testimony given by Sergeant Savage at the suppression hearing showed that "the primary purpose of the checkpoint was to [impermissibly] advance 'the general interest in crime control' and 'investigating crimes'" [Doc. 32 at 5].

"[T]he Supreme Court has upheld brief, suspicionless seizures of motorists at a sobriety checkpoint aimed at removing drunk drivers from the road." Regan, 218 F. App'x at 904 (citing Sitz, 496 U.S. at 445). The Supreme Court has also "suggested that a roadblock to question all oncoming traffic to verify[] drivers' licenses and vehicle registrations with the interest of serving highway safety would be permissible under the Fourth Amendment." Id. See also Delaware v. Prouse, 440 U.S. 648, 663 (1979) (making the suggestion). But "a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing violates the Fourth Amendment." Id. (citing Edmond, 531 U.S. at 37-38).

In this case, "the after arrest reports and suppression hearing testimony confirmed that the [roadblock] was executed for the important state interest of ensuring compliance with the state's driver licensing and vehicle registration laws, and to

21

check for drunk [or otherwise intoxicated] drivers." Id. at 905 (citation omitted). Sergeant Savage and others testified that HCPD officers established the May 6 roadblock to conduct sobriety checks and examine driver's licenses and vehicle registrations. And as a result of the roadblock, HCPD officers made multiple arrests for driving under the influence and at least one arrest for driving on a suspended driver's license. No evidence adduced at the suppression hearing indicated either an impermissible subjective intent on the part of HCPD officers in establishing the May 6 roadblock or any objective results from the May 6 roadblock suggesting that HCPD officers used the roadblock to dig for evidence of ordinary, general criminal wrongdoing.

In his objections, Defendant focuses on testimony given by Sergeant Savage at the suppression hearing that officers would prolong a vehicle stop at the May 6 roadblock if they "notice[d] something that require[d] further investigation such as somebody . . . under the influence of alcohol or something of that nature." But this testimony does not support Defendant's conclusion that HCPD officers established and conducted the May 6 roadblock to generally investigate potentially illegal behavior. Sergeant Savage qualified her suppression hearing testimony as she gave it, stating only that HCPD officers would further investigate drivers who appeared "to be under the influence of alcohol or something of that nature." The most commonsense reading of this testimony indicates that HCPD officers would conduct further investigation if a driver appeared sufficiently impaired from consuming alcohol or some other intoxicating substance, not that officers would use the roadblock as a means of investigating criminal wrongdoing in

22

general. Defendant attempts to stretch Sergeant Savage's testimony further than any reasonable reading of that testimony permits.

For these reasons, the Court concludes that HCPD officers established and conducted the May 6 roadblock for the limited, valid purposes of checking driver's licenses, vehicle registrations, and drivers' sobriety. The Court thus OVERRULES Defendant's objection to the conclusion in the R&R to that effect.

c. Conducting the May 6 Roadblock

Finally, Defendant challenges the manner in which HCPD officers conducted the May 6 roadblock, pointing out that no evidence adduced at the suppression hearing indicated that the officers stopped any of the vehicles traveling eastbound on Eagles Landing Parkway during the roadblock.

This objection lacks merit. "[T]he failure to stop 'all' vehicles does not necessarily render the stop of remaining vehicles the kind of random exercise of officer discretion [that the Supreme Court] condemned" in Delaware v. Prouse. State v. Stearns, 524 S.E.2d 554, 556 (Ga. Ct. App. 1999). The Constitution prohibits law enforcement officers from exercising unbridled discretion in stopping vehicles at random, without a warrant or any underlying suspicion of criminal activity. See Prouse, 440 U.S. at 659 ("[W]e are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment."). Conversely, however, the Constitution permits officers to conduct roadblocks on only one side of a two-way road, so long as the officers stop all vehicles proceeding along that side of the road. See Stearns, 524 S.E.2d at 556 (officers' failure to stop any southbound vehicles,

23

where evidence showed that officers stopped all northbound vehicles, "was not fatal to the roadblock's reasonableness").

Evidence adduced at the suppression hearing indicated that HCPD officers conducting the May 6 roadblock stopped all vehicles proceeding westbound on Eagles Landing Parkway. The officers did not randomly choose vehicles to stop or "wave" certain vehicles through the roadblock unexamined. The mere fact that HCPD officers did not also stop eastbound vehicles during the May 6 roadblock does not render the roadblock unconstitutional.

For that reason, the Court OVERRULES Defendant's final objection to the conclusion in the R&R that the May 6 roadblock comported with the Fourth Amendment.

> 2. Officer McNure's Seizure of the Bag of Marijuana

Defendant next objects "to the R&R failing to find that [Officer McNure's] seizure of the bag of alleged marijuana was illegal under the Fourth Amendment" [Doc. 32 at 5].[18]

This objection lacks merit. First, as noted in the R&R, Officer McNure did not "search" the BMW sport utility vehicle, for Fourth Amendment purposes, when he shone his flashlight into the vehicle during the May 6 roadblock traffic stop. See Texas v. Brown, 460 U.S. 730, 739-40 (1983) ("[S]hining [a] flashlight to illuminate the interior of [a] car [stopped at a driver's license checkpoint] trenche[s] upon no right secured to the [driver of

---

[18] At the outset, the Court notes that "[t]he question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers." Preston v. United States, 376 U.S. 364, 366 (1964) (citing Elkins v. United States, 364 U.S. 206 (1960)).

24

that car] by the Fourth Amendment."); United States v. Bradley,
No. CR409-167, 2009 WL 4281260, at *3 (S.D. Ga. Nov. 5, 2009)
("Illuminating the interior of a vehicle by means of a flashlight
does not constitute a search.") (citations omitted); United States
v. Harrison, No. 5:07-CR-410 (NAM), 2008 WL 2626829, at *6 n.5
(N.D.N.Y. June 27, 2008) ("'[O]nce a vehicle is lawfully stopped,
a police officer's looking through the windows into the vehicle
from outside, even when shining a flashlight to illuminate the
inside of the vehicle, does not constitute a 'search' of the
vehicle within the meaning of the Fourth Amendment.'") (quoting
Mollica v. Volker, 229 F.3d 366, 369 (2d Cir. 2000)).

Once Officer McNure permissibly saw the bag of suspected
marijuana[19] in plain view on the vehicle's center console, he had
reasonable suspicion to detain Defendant further to investigate
his possession of the substance. See United States v. Harris, 928
F.2d 1113, 1117 (11th Cir. 1991) (after a legal traffic stop, law
enforcement officers have "'the duty to investigate suspicious
circumstances that then [come] to [their] attention'") (quoting
United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988)). See
also Edmond, 531 U.S. at 48 (refusing to "impair the ability of

---

[19] Defendant also objects that "the [G]overnment failed to
present evidence at the [suppression] hearing that the substance
[seized by Officer McNure] . . . in fact tested positive as
marijuana" [Doc. 32 at 8]. This objection goes not to the
constitutionality of the search for, or seizure of, the suspected
marijuana, but rather to the Government's burden of proof were it
to prosecute Defendant for possessing the suspected narcotics—a
matter not at all implicated by the pending indictment. As such,
this contention, even if taken as true, is not properly addressed
via a motion to suppress. This objection is OVERRULED.

police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose").

At that point, too, Officer McNure had probable cause to arrest Defendant for such possession and, moreover, to search the vehicle for evidence of further illegal behavior.    See United States v. Rodriquez, 312 F. App'x 205, 210 (11th Cir. 2009) (per curiam) (once officers "saw [a] bag of methamphetamine on [a validly-stopped vehicle's] center console, the officers had probable cause to arrest [the defendant] and his cohorts for their possession of the illegal substance and to search the vehicle for additional contraband") (citation omitted).

Officer McNure crossed no constitutional boundaries in using his flashlight to see the suspected marijuana on the vehicle's center console during the valid roadblock traffic stop, in detaining Defendant further to investigate his possession of the suspected marijuana, or in asking or directing Defendant to hand him the bag containing the suspected marijuana (which Defendant did, of his own volition). For these reasons, the Court OVERRULES Defendant's objection to the conclusion in the R&R that Officer McNure's seizure of the bag of marijuana from the stopped BMW sport utility vehicle comported with the Fourth Amendment.

> 3.    Defendant's Detention, Seizure, and Police Questioning at the May 6 Roadblock

Defendant next objects "to the R&R failing to find that the detention, seizure, arrest, and questioning of Defendant [at the

May 6 roadblock] was illegal" [Doc. 32 at 5]. Defendant also objects to

> the R&R failing to find that Defendant was
> under arrest at [the] point [where Officer
> McNure asked him questions next to the
> pulled-over sport utility vehicle], despite
> the fact [that Officer] McNure testified
> [that] he seized alleged marijuana, ordered
> Defendant to pull his vehicle over, ordered
> Defendant outside of his vehicle and to come
> to the rear of his vehicle, and admitted
> [that] Defendant was not free to leave.

[Doc. 32 at 7]. Defendant seeks to suppress the statements made in response to Officer McNure's questions at the May 6 roadblock, arguing that he was interrogated while in custody without being advised of, or validly waiving, his rights under Miranda.

"[T]he right to Miranda warnings attaches when custodial interrogation begins." United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citing United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004)). See also United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) ("Miranda warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.").

Thus, two prerequisites—custody and interrogation—must exist in tandem to necessitate the issuance of   Miranda warnings. Conversely, voluntary statements by a person in custody and responses to noncustodial interrogation are both admissible, even where no Miranda warnings were given. See generally Rhode Island v. Innis, 446 U.S. 291, 299-302 (1980).

For purposes of Miranda, the term "interrogation" refers to either "express questioning or its functional equivalent." Id. at 300-01. The "functional equivalent" of express questioning denotes

27

any "words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from [a] suspect." Id. at 301 (internal footnote omitted).

Defendant argues that Office McNure knew or should have known that his questions regarding the marijuana and handgun clip seen in the sport utility vehicle were likely to elicit incriminating responses. But even assuming, for the sake of argument, that those questions constituted an "interrogation" for Miranda purposes, the Court concludes that such interrogation did not occur while Defendant was "in custody" of law enforcement.

"A defendant is in custody for the purposes of Miranda when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Brown, 441 F.3d at 1347 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (quotation marks omitted)). This inquiry "'depends on whether[,] under the totality of the circumstances, a reasonable man in [Defendant's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.'" United States v. Beltran, No. 09-11071, 2010 WL 729241, at *2 (11th Cir. Mar. 4, 2010) (quoting Beheler, 463 U.S. at 1125). This "'test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant.'" Brown, 441 F.3d at 1347 (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (citation omitted)). "'[U]nder the objective standard, the reasonable person from whose perspective "custody" is defined is

28

a reasonable *innocent* person.'" Id. (quoting, with alteration and emphasis, Moya, 74 F.3d at 1119).

Traffic stops, however, are special cases that necessarily implicate a certain minimal amount of restraint on an individual's freedom of movement in order to effectuate their basic purpose. Acosta, 363 F.3d at 1148-49. Such situations ordinarily do not "involve the type of highly intrusive coercive atmosphere that may require *Miranda* warnings before a formal arrest is made." Id. at 1150 (internal quotation marks omitted). The Court thus must inquire "'whether [the roadblock] traffic stop exert[ed] upon [Defendant] pressures that sufficiently impair[ed] his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'" Id. at 1149 (quoting Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). To have been "in custody" of Officer McNure and the HCPD before his formal arrest on May 6, Defendant's freedom must have been restricted "'to a degree associated with formal arrest.'" Berkemer, 468 U.S. at 440 (quoting Beheler, 463 U.S. at 1125).

The Court concludes that any "pressure" exerted on Defendant during the brief questioning by Officer McNure did not restrict Defendant's freedom or freedom of movement to a degree associated with, or comparable to, a formal arrest. Officer McNure's request that Defendant exit the pulled-over sport utility vehicle and walk to the back of the car did not place Defendant "in custody" of Officer McNure or the HCPD officers conducting the May 6 roadblock. See United States v. Nguyen, No. 2:05CR130-3, 2006 WL 2260104, at *8 (D. Vt. Aug. 7, 2006) ("[f]ollowing a vehicle stop,

an officer may order a suspect to exit the [stopped] vehicle" without necessitating <u>Miranda</u> warnings) (citations omitted).

At no point during the brief time between the traffic stop and Defendant's formal arrest did any HCPD officer threaten him or otherwise act in an intimidating or coercive manner. Defendant was not in handcuffs or other restraints during the brief questioning by Officer McNure, and neither Officer McNure nor any other HCPD officer informed Defendant that he was under arrest when that questioning took place. Although Defendant was concededly not free to leave, the level of restraint to which Officer McNure subjected him during the questioning—which took place in plain view of other HCPD officers, other cars proceeding through the May 6 roadblock, and the public in general—was the "minimal amount necessary for such a stop." <u>Acosta</u>, 363 F.3d at 1150. <u>See also</u> <u>United States v. Crawford</u>, 294 F. App'x 466, 474 (11th Cir. 2008) (per curiam) (denying motion to suppress statements made during traffic stop and pertinently noting that, "[a]t the time of the questioning, [the defendant] was standing at the back of his car in . . . public view, he was not physically restrained, he was questioned only briefly and he was not told he was going to be arrested").

For these reasons, the Court concludes that Defendant was not "in custody" of law enforcement, as to necessitate the issuance of <u>Miranda</u> warnings, when Officer McNure asked him about the marijuana and handgun clip that he permissibly saw in the center console area of the BMW sport utility vehicle during the May 6 roadblock. As a result, the Court OVERRULES Defendant's objection to the conclusion in the R&R that Defendant's "statements are not

due to be suppressed because he was not in custody when questioned by Officer McNure" [Doc. 27 at 29].

> 4. Warrantless Search of the BMW Sport Utility Vehicle at the May 6 Roadblock

Defendant next objects to the conclusion in the R&R that HCPD officers' warrantless search of the BMW sport utility vehicle, after Defendant had been formally arrested and placed in the back of Officer McNure's patrol vehicle, was a lawful search incident to arrest. Defendant argues that HCPD officers "did not have any information or reason to believe that any evidence of additional drugs would be found in the vehicle and did not smell any marijuana prior to searching the vehicle" [Doc. 32 at 13]. "As such," Defendant claims, "the search was illegal and not pursuant to a valid inventory search, search incident to arrest, the automobile exception [to the warrant requirement], or under any . . . exception" to the warrant requirement recognized in Arizona v. Gant, 129 S. Ct. 1710 (2009) [Doc. 32 at 13].

"'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Id. at 1716 (quoting Katz v. United States , 389 U.S. 347, 357 (1967) (footnote omitted)). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." Id. (citing Weeks v. United States, 232 U.S. 383, 392 (1914)).

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search of it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these

31

> justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

Id. at 1723-24.

The Court agrees with Magistrate Judge Vineyard's conclusion that "a reasonable officer could not consider [Defendant] capable of accessing his vehicle at the time the search was conducted." United States v. Goldsmith, Criminal Action No. 4:09cr94, 2009 WL 4884408, at *3 (E.D. Tex. Dec. 10, 2009). But the Court also agrees with Magistrate Judge Vineyard's conclusion that "the officers' [warrantless] search of [the BMW sport utility] vehicle was lawful under Gant [as a search incident to arrest] because the officers had a reasonable basis to believe [that] the search would uncover evidence relevant to [Defendant's] arrest for possession of marijuana—namely, marijuana" [Doc. 27 at 33].

Here, Officer McNure arrested Defendant for possessing suspected marijuana that Officer McNure saw, in plain view, on the center console of the BMW sport utility vehicle. Defendant's act of storing, and Officer McNure's discovery of, that physical contraband inside the sport utility vehicle—far different from the driving on a suspended driver's license offense of arrest in Gant—gave Officer McNure reason to believe that the sport utility vehicle might contain additional narcotics, which validated the warrantless search of the sport utility vehicle incident to Defendant's arrest, even under the standard announced in Gant.[20]

---

[20]  See United States v. Bradford , No. 09-CR-71, 2009 WL 3754174, at *3 (E.D. Wis. Nov. 5, 2009) (applying Gant and

32

And "[w]hile *Gant* limit[ed] the search incident to arrest exception, *Gant* also affirmed the viability of the probable cause exception for automobiles." <u>Goldsmith</u>, 2009 WL 4884408, at *3 (citing <u>Gant</u>, 129 S. Ct. at 1719). "The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a warrant is obtained." <u>United States v. Thomas</u>, 536 F. Supp. 736, 742 (M.D. Ala. 1982).

"'Probable cause exists when the facts and circumstances would lead a reasonably prudent [person] to believe that [a] vehicle contains contraband.'" <u>United States v. Talley</u>, 108 F.3d 277, 281 (11th Cir. 1997) (quoting, with alteration, <u>United States v. Campbell</u>, 920 F.2d 793, 796 (11th Cir. 1991) (internal quotations omitted)). And "the ability of a vehicle to become mobile is sufficient to satisfy the exigency requirement." <u>United States v. Alexander</u>, 835 F.2d 1406, 1409 (11th Cir. 1988) (citing <u>California v. Carney</u>, 471 U.S. 386, 392-93 (1985)).

Here, the mobility of the sport utility vehicle provided HCPD officers with the needed exigency to support a warrantless search. Also, the circumstances of Defendant's arrest—especially the

---

concerning that, where defendant arrested for possession of drug paraphernalia, officer had reasonable basis to search defendant's vehicle for drugs); <u>United States v. Reynolds</u>, No. 3:08-CR-143, 2009 WL 1588413, at *3 (E.D. Tenn. June 4, 2009) (applying <u>Gant</u> and concluding that, where defendant Smith arrested for alleged possession of marijuana, "it was reasonable for the officers to believe that a search of defendant Smith's vehicle would produce evidence related to that crime").

marijuana initially seen on the vehicle's center console—gave officers probable cause to believe that the vehicle contained additional contraband. See United States v. Edwards, 307 F. App'x 340, 342, 344 (11th Cir. 2009) (per curiam) (officer who observed bag of marijuana in plain view in defendant's vehicle had probable cause to search vehicle "under the exception to the warrant requirement for . . . automobile searches") (citing Alexander, 835 F.2d at 1409).

For these reasons, the Court concludes, upon de novo review, that Magistrate Judge Vineyard did not err in determining that the search incident to arrest exception, even after Gant, as well as the automobile exception to the Fourth Amendment's warrant requirement permitted HCPD officers' warrantless search of the BMW sport utility vehicle that Defendant drove up to the May 6 roadblock. HCPD officers needed no additional evidence of criminal wrongdoing to conduct that search than what they already had. Defendant's objections to the contrary are therefore OVERRULED.

### 5.   Canine Sniff of Cash Seized from the BMW Sport Utility Vehicle

In the R&R, Magistrate Judge Vineyard concluded that, even though the Government presented "no evidence concerning the training of the particular canine" that, according to Officer McNure, sniffed and alerted on the paper bags containing the cash seized from the BMW sport utility vehicle on May 6, "the proper procedural avenue for [moving to exclude evidence derived from the canine sniff of the bags would be] to file a motion in limine, not a motion to suppress evidence" [Doc. 27 at 39 n.24].

Defendant objects to this conclusion, clarifying that he moved "to suppress evidence derived from the illegal dog sniff of the money, evidence of the dog sniff itself, and the alleged 'alert' to the money" [Doc. 32 at 13]. Defendant argues that such evidence must be suppressed because (1) the Government introduced no evidence that Officer McNure had knowledge or training about canine sniffs or with this canine in particular, (2) the Government "failed to provide any requested Rule 16 materials regarding the qualifications, certifications, or identities of the canine or its handler to [Defendant's] counsel" [Doc. 32 at 14], and (3) the Government "failed to present any evidence at the [suppression] hearing regarding whether this particular [canine] was a certified or trained dog in detecting any narcotics, let alone a 'well-trained narcotics-detection dog'" [Doc. 32 at 15].

This objection lacks merit. Defendant cites no authority to support his argument that evidence derived from a canine sniff of evidence previously (and lawfully) seized by law enforcement, or evidence of the canine sniff itself, may be suppressed on constitutional grounds for any of the reasons listed above.[21]

---

[21] In his objections, Defendant relies solely on Illinois v. Caballes, 543 U.S. 405 (2005). In Caballes, the Supreme Court assessed whether the Fourth Amendment requires reasonable, articulable suspicion to justify walking a drug-detection dog around a vehicle during an otherwise valid, legitimate traffic stop. Id. at 407. The Court noted that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'" Id. at 408 (quoting United States v. Jacobsen, 466 U.S. 109, 123 (1984)). From this premise, the Court concluded that "the use of a well-trained narcotics-detection dog—one that does not expose noncontraband

"A warrantless search and seizure of a car is permissible when the police have probable cause to believe the car contains contraband." United States v. Nelson, 309 F. App'x 373, 375 (11th Cir. 2009) (per curiam) (citing United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007)). "In the case of dog sniffs, 'probable cause arises when a drug-trained canine alerts to drugs.'" Id. (quoting United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993)). "A dog sniff must be sufficiently reliable in order to establish probable cause, and this reliability is generally present if the dog is 'well-trained.'" Id. (citations omitted). "Evidence of a dog's training is sufficient proof of reliability." Id. (citing United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982)).

The Government's failure to introduce evidence, at the suppression hearing, of the training of the canine that sniffed the paper bags containing the seized cash, or its handler, or

---

items that otherwise would remain hidden from public view—during a lawful traffic stop[] generally does not implicate legitimate privacy interests" or, as a corollary, the Fourth Amendment. Id. at 409 (internal quotation omitted). "Any intrusion on . . . privacy expectations [caused by walking a well-trained narcotics-detection dog around a validly-stopped vehicle would] not rise to the level of a constitutionally cognizable infringement." Id.

Contrary to Defendant's contention, the Supreme Court did not hold in Caballes that "the dog conducting [a] dog-sniff [must] be trained and certified to detect narcotics" for a canine sniff conducted by law enforcement to meet constitutional standards [Doc. 32 at 15]. The Court instead held that law enforcement needs no reasonable or articulable suspicion to use a well-trained narcotics-detection dog to sniff the area surrounding a validly-stopped vehicle for odors indicating the possession of contraband. Caballes, and Defendant's reliance thereon, are thus inapposite.

Officer McNure, would only rise to a matter of *constitutional* dimension if Defendant asserted, pursuant to the foregoing authorities, that insufficient proof of the canine's training prevented law enforcement from garnering probable cause to search Defendant or his property without a warrant.

Defendant does not take this path, and wisely so—in this case, HCPD officers did not rely on the canine sniff as grounds for probable cause to search Defendant or his property without a warrant. HCPD officers had already lawfully seized the evidence that the canine eventually sniffed. At the time of the canine sniff, HCPD officers did not need probable cause—or any cause at all—to expose the canine to the lawfully-seized cash.

The points of contention expressed by Defendant in his objections go to the reliability of the evidence of the canine sniff (and any additional evidence derived therefrom), not the constitutionality of the canine sniff procedure employed by HCPD officers. Magistrate Judge Vineyard thus correctly concluded in the R&R that a motion in limine, rather than a motion to suppress, is the proper procedure for limiting the Government's use of the canine sniff, or any evidence derived therefrom, at trial. The Court OVERRULES Defendant's objection to that conclusion.

6.   Waiver of *Miranda* Rights at HCPD Headquarters

Defendant next objects "to the R&R finding that Defendant validly waived his Miranda rights [before the interview conducted by Agent Allen at HCPD headquarters], and that if he did not expressly waive his rights, [that] he impliedly waived his rights by speaking with Agent Allen" [Doc. 32 at 15].

37

The pertinent inquiry for the Court is "whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." North Carolina v. Butler, 441 U.S. 369, 373 (1979). "A waiver of one's *Miranda* rights need not be express to be valid." United States v. Deal, No. 3:08-cr-368-J-34JRK, 2009 WL 5386061, at *13 (M.D. Fla. July 29, 2009) (citing Butler, 441 U.S. at 373). For instance, "[w]hen a suspect speaks to law enforcement officers of his own free will after being advised as required by *Miranda*, a waiver of those rights may be implied." Id. (citations omitted). But "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." Miranda, 384 U.S. at 475.

"The government bears the burden of proving by a preponderance of the evidence that [Defendant] validly waived [his] *Miranda* rights." United States v. Harrold, 679 F. Supp. 2d 1336, 1349 (N.D. Ga. 2009) (Thrash, J.) (citations omitted). Ultimately, "[w]hether a defendant validly waived his or her [Miranda] rights is determined by examining the totality of the circumstances." Id. at 1350 (citation omitted).

The Court concludes, given the totality of the circumstances, that Defendant knowingly and intelligently, though implicitly, waived his Miranda rights by agreeing to speak with Agent Allen at HCPD headquarters on the morning of May 6.

After informing Defendant of his Miranda rights, including his right to remain silent, by reading from a standard-issue rights form in the presence of another officer, Agent Allen asked Defendant if he would mind answering some questions. Defendant,

who does not argue that he was unaware of his right to remain silent by this point, told Agent Allen that he would speak to him and subsequently made various statements. No evidence adduced at the suppression hearing indicated that Agent Allen deceived, coerced, or threatened Defendant in any way during the brief, ten- to fifteen-minute interview. And Magistrate Judge Vineyard did not impermissibly rely on Defendant's silence to find in the R&R that he implicitly waived his Miranda rights.

7.   Warrantless Search of Defendant's Cell Phone

Defendant next objects to "the R&R finding that Agent Allen lawfully searched Defendant's cell phone under the automobile exception to the warrant requirement" and to "the R&R finding that evidence seized from the cell phone search is admissible at trial" [Doc. 32 at 16, 17].

Courts have recognized that individuals retain a reasonable expectation of privacy in the information stored in their cell phones, United States v. Finley, 477 F.3d 250, 259 (5th Cir. 2007), although the exact nature and extent of that reasonable privacy expectation remains a subject of debate. Compare United States v. Dennis, No. 07-008-DLB, 2007 WL 3400500, at *7-*8 (E.D. Ky. Nov. 13, 2007) (information retrieved from cell phone no different than any other evidence seized incident to arrest) with United States v. Park, No. CR-05-375 SI, 2007 WL 1521573, at *8-*9 (N.D. Cal. May 23, 2007) (cell phones carry heightened expectation of privacy due to immense amounts of private, personal information capable of being stored thereon).

This debate aside, the Fourth Amendment generally "require[s] law enforcement officers to obtain a warrant to search [a] cell

39

phone unless a recognized exception to the warrant requirement exist[s]." United States v. McGhee, No. 8:09CR31, 2009 WL 2424104, at *3 (D. Neb. July 21, 2009). See also United States v. Mercado-Nava, 486 F. Supp. 2d 1271, 1277 (D. Kan. 2007) ("Traditional search warrant exceptions apply to the search of cell phones.").

As discussed above in the context of HCPD officers' warrantless search of the sport utility vehicle at the May 16 roadblock, one exception to the Fourth Amendment's warrant requirement involves situations where law enforcement officers discover, seize, and search personal property located in a functioning, mobile vehicle. See generally California v. Acevedo, 500 U.S. 565 (1991); United States v. Ross, 456 U.S. 798 (1982). "Under the automobile exception to the warrant requirement, officers can [also] search any container in an operational car without a warrant as long as they have probable cause to believe that the container holds evidence of a crime." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (citing Acevedo, 500 U.S. at 579-80; United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003)). As with searches incident to arrest, the Fourth Amendment does not require that warrantless container searches invariably be conducted "immediately as part of the vehicle inspection or soon thereafter." United States v. Johns, 469 U.S. 478, 484 (1985) (internal quotation marks omitted).

Courts confronting the issue have often permitted warrantless cell phone searches by analogizing cell phones to a "container,"

similar to a wallet or a purse.[22] At the same time, other courts have been unwilling to extend the automobile exception to sanction the warrantless search of cell phones and their contents, given the vast amounts of data that some cell phones contain or may store, making them more analogous to computers than traditional telephones, pagers, or closed containers.[23]

---

[22] See, e.g., United States v. Garcia-Aleman, No. 1:10-CR-29, 2010 WL 2635071, at *12 (E.D. Tex. June 9, 2010) ("[B]ecause probable cause existed to believe that evidence of a crime would be found in the cell phone information . . . , the automobile exception gave law enforcement officers latitude to search Benitez's cell phones like it would allow the search of other closed containers in the pickup truck."); United States v. Wurie, 612 F. Supp. 2d 104, 109 (D. Mass. 2009) ("Decisions of district courts and Courts of Appeals (often analogizing cell phones to the earlier pager technology) trend heavily in favor of finding that the search incident to arrest or [automobile] exceptions apply to searches of the contents of cell phones.") (citations omitted); United States v. James, No. 1:06CR134 CDP, 2008 WL 1925032, at *4 (E.D. Mo. Apr. 29, 2008) ("Because probable cause existed to believe that evidence of a crime would be found in the cell phone call records and address book, the automobile exception allows the search of the cell phone just as it allows a search of other closed containers found in vehicles."); United States v. Fierros-Alvarez, 547 F. Supp. 2d 1206, 1213-14 (D. Kan. 2008) (automobile exception justified warrantless search of cell phone found in vehicle); United States v. Galante, No. 94 Cr. 633(LMM), 1995 WL 507249, at *3 (S.D.N.Y. Aug. 25, 1995) (pager and cell phone analogous to "containers" in assessing applicability of automobile exception); State v. Boyd, 992 A.2d 1071, 1090 (Conn. 2010) (approving warrantless search and seizure of cell phone and its contents as "container" searched pursuant to automobile exception).

[23] See, e.g., United States v. Carey, 172 F.3d 1268, 1275 (10th Cir. 1999) ("Relying on analogies to closed containers . . . may lead courts to oversimplify a complex area of Fourth Amendment doctrines and ignore the realities of massive modern computer

41

Under the circumstances of this case, the Court agrees with the conclusion in the R&R that the automobile exception to the Fourth Amendment's warrant requirement justified Agent Allen's brief search of Defendant's lawfully-seized cell phone.[24]

That exception permits the warrantless search of any container in an operational vehicle if probable cause exists to believe that the container holds evidence of a crime, either at the time of the arrest or at some point thereafter. And the Court concludes, consistent with the other courts mentioned above, that Defendant's cell phone was a "container," for purposes of the automobile exception, in that it contained information—recent calls, contacts' telephone numbers, and so forth—not readily apparent without manipulating the cell phone itself.[25]

---

storage."); State v. Smith, 920 N.E.2d 949, 954 (Ohio 2009) ("Even the more basic models of modern cell phones are capable of storing a wealth of digitized information wholly unlike any physical object found within a closed container. We thus hold that a cell phone is not a closed container for purposes of a Fourth Amendment analysis.").

[24] The Court also notes, as did Magistrate Judge Vineyard [Doc. 27 at 43 n.27], that nearly all of the objections made and cases cited by Defendant involve warrantless cell phone searches by law enforcement as inventory searches or searches incident to arrest. See United States v. Wall, No. 08-60016-CR, 2008 WL 5381412, at *3-*4 (S.D. Fla. Dec. 22, 2008); Park, 2007 WL 1521537, at *9-*11; Preston v. United States, 376 U.S. 364, 367-68 (1964). These cases are not relevant, insofar as the facts of this case are concerned, to the Court's analysis of the independent automobile exception to the warrant requirement.

[25] Cf. Bryan A. Stillwagon, Bringing an End to Warrantless Cell Phone Searches, 42 Ga. L. Rev. 1165, 1195-98 (2008) (concluding, in the analogous context of searches incident to arrest, that cell phones "are easily distinguishable from . . .

42

As indicated above, in permissibly observing a bag of suspected marijuana and a handgun clip in plain view on the center console area of the BMW sport utility vehicle, Officer McNure had probable cause to search the vehicle for additional evidence of a drug crime at the May 16 roadblock. The strong odor of what Officer McNure perceived to be raw marijuana, upon opening the vehicle's doors, reinformed that preexisting probable cause.

During the subsequent search of the sport utility vehicle, HCPD officers located and seized over $50,000 in cash, several firearms, and multiple cell phones. These circumstances, in turn, gave HCPD officers probable cause to search Defendant's cell phone, which officers found amidst, and in the same vehicle as, the cash, firearms, and suspected illegal narcotics.

"Probable cause typically exists 'where the circumstances would lead a reasonable person to believe a search will disclose evidence of a crime.'" United States v. Reed, 318 F. App'x 774, 776 (11th Cir. 2009) (per curiam) (quoting United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir. 2002)). The term "probable cause" is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Ornelas v. United States, 517 U.S. 690, 695 (1996) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983) (internal quotation marks omitted)). "The principal components of a determination of . . . probable cause [are] the events which occurred leading up to

---

closed containers" such as briefcases, purses, wallets, and address books).

[a] . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." Id. at 696.

The cash, suspected illegal narcotics, and firearms found in the sport utility vehicle at the May 16 roadblock all supported officers' reasonable belief regarding Defendant's involvement in drug use or transactions. See United States v. Brooks, 594 F.3d 488, 495 (6th Cir. 2010) ("Courts have readily acknowledged that large sums of cash are indicative of the drug trade," and "the indication [is often] confirmed by the presence of . . . marijuana seeds and the odor of marijuana smoke."); United States v. Mendoza-Salgado, 964 F.2d 993, 1008 (10th Cir. 1992) ("The courts generally view items such as firearms, large quantities of cash, and uncharged quantities of drugs as 'tools of the trade' for distributing illegal drugs.").

In conjunction with these recognized tools of the drug trade that officers located in the sport utility vehicle, the Court of Appeals and numerous other federal appellate courts recognize that cell phones are "a known tool of the drug trade." United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990). See also United States v. Lazcano-Villalobos, 175 F.3d 838, 844 (10th Cir. 1999) ("[C]ellular telephones are recognized tools of the drug-dealing trade.") (citation omitted); United States v. Sasson, 62 F.3d 874, 886 (7th Cir. 1995) (describing possession of cell phones, among several other objects, as one of "the usual 'trappings' of a person involved in the drug trade"); United States v. De La Cruz, 996 F.2d 1307, 1311 (1st Cir. 1993) (labeling cell phones and beepers as "well known tools of the drug trade").

As such, the seizure of multiple cell phones, in combination with the seizure of suspected marijuana, firearms, and a large sum of cash discovered in a shoe box, would together warrant a "man of reasonable caution" to believe that the contacts and recent calls located on Defendant's personal cell phone might contain some additional evidence of illegal drug distribution activity.

Agent Allen went no further into the depths of the information stored on Defendant's cell phone than those relatively unobtrusive databases: the phone calls recently made from the phone and the contacts stored thereon. In such circumstances, and given the totality of the facts surrounding the cell phone's seizure and ultimate search, the Court concludes that the automobile exception to the Fourth Amendment's warrant requirement permitted Agent Allen's brief warrantless search of Defendant's cell phone at HCPD headquarters. As a result, the Court OVERRULES Defendant's objection to the conclusion in the R&R to that effect.

### 8.   Warrantless Entry and Search of 1228 Ithaca Drive Residence

Defendant next objects to the conclusion in the R&R "that the entry and initial search of . . . Defendant's residence [at 1228 Ithaca Drive] without a search warrant" was legal [Doc. 32 at 24]. Notably, Defendant does not dispute the validity of the warrant issued for his arrest prior to that entry and search.

### a.   Warrantless Entry Based on Valid Arrest Warrant

"Warrantless searches and seizures inside a home are presumptively unreasonable." United States v. Bennett, 555 F.3d 962, 965 (11th Cir. 2009) (citing United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000)). But "for Fourth Amendment

purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which [a] suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980).

"Agents executing an arrest warrant must have reason to believe that (1) 'the location to be searched is the suspect's dwelling' and (2) 'the suspect is within the dwelling.'" Bennett, 555 F.3d at 965 (quoting Bervaldi, 226 F.3d at 1263). "The reasonableness of the belief is evaluated based on 'the facts and circumstances within the knowledge of the law enforcement agents . . . when viewed in totality.'" Id. (quoting United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995)).

The day after a warrant was issued for Defendant's arrest, Agent Sheppard began developing information permissibly obtained from a database search that linked Defendant to the 1228 Ithaca Drive residence. Agent Sheppard also received information from a postal inspector that Defendant and an individual named Keith Cole had been receiving mail at that address. Agent Sheppard and other law enforcement agents subsequently conducted several hours' worth of surveillance at the 1228 Ithaca Drive residence.

On December 16, 2009, Agent Sheppard observed the black BMW sport utility vehicle that Defendant had driven into the May 6 roadblock pull into the driveway of the 1228 Ithaca Drive residence and identified Defendant as the vehicle's driver. Agent Sheppard saw Defendant stop the vehicle in the driveway, converse with his girlfriend, Tanner, for two to three minutes, pull the vehicle into the garage, park the vehicle, get out, and enter the residence. Agent Sheppard then observed Tanner, and Tanner alone,

46

leaving the 1228 Ithaca Drive residence in a different vehicle. When Agent Sheppard returned with his assembled arrest team, Defendant was still located inside the residence.

Based on Agent Sheppard's database search, his conversation about Defendant's possible whereabouts with a postal inspector, and law enforcement agents' surveillance of the 1228 Ithaca Drive residence, the agents who entered the residence without a warrant on December 16 had reason to believe, from the totality of the facts that they knew at the time, that Defendant was residing at, and located within, the 1228 Ithaca Drive residence. This reasonable belief, in turn, justified their warrantless entry.

b.    The Knock-and-Announce Requirement

A federal or state law enforcement officer

> may break open any outer door or inner door
> or window of a house, or any part of a house,
> or anything therein, to execute a search [or
> arrest] warrant, if, after notice of his
> authority and purpose, he is refused
> admittance or when necessary to liberate
> himself or a person aiding him in the
> execution of the warrant.

18 U.S.C. § 3109. See also United States v. Smith, Crim. A. No. 4-96-CR-15 HLM, 1996 WL 735569, at *2 (N.D. Ga. Aug. 27, 1996) (Murphy, J.) ("Generally, before executing a . . . warrant, federal and state officers must provide the occupants of a house with notice of authority and purpose before breaking open any outer or inner door or window.") (citations omitted).

"If the occupants do not admit the officers within a reasonable period of time, the officers may be deemed to be constructively refused admittance, and they may then enter by force." United States v. Gay, 240 F.3d 1222, 1228 (10th Cir. 2001)

(quotation omitted). See also United States v. Thoussaint, No. 2:09-cr-117-MEF, 2010 WL 447107, at *3 (M.D. Ala. Feb. 4, 2010) ("[T]he knowledge that the apartment was Thoussaint's residence coupled with the reasonable belief that he was inside, but attempting to hide from the officers, validates the entry to execute the arrest warrant.").

Section 3109 of Title 18 comports with the Fourth Amendment, which generally dictates that "law enforcement officers [executing search and arrest warrants] must announce their presence and provide residents an opportunity to open the door." Hudson v. Michigan, 547 U.S. 586, 589 (2006) (citation omitted). See also United States v. Segura-Baltazar, 448 F.3d 1281, 1289 (11th Cir. 2006) ("The Fourth Amendment incorporates the important common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry.") (citation omitted).

As in his brief submitted after the suppression hearing, Defendant relies on Cotton's testimony to support his argument that the agents who entered the 1228 Ithaca Drive residence on December 16 did not sufficiently knock and announce their presence and purpose before the warrantless entry. As noted above, Cotton's testimony was consistent with the agents' testimony that they knocked at least twice before entering the residence. To the extent that Cotton's testimony contradicted the agents'—namely, regarding Agent Sheppard's initial knock-and-announce and the amount of time between the last two knocks and the agents' actual entry—Magistrate Judge Vineyard simply gave the agents' testimony greater weight than Cotton's. Defendant presents the Court with no

48

reason, aside from continuing to press Cotton's version of the facts, to question Magistrate Judge Vineyard's determination regarding the veracity of the testimony presented at the suppression hearing. Without more, and given the undisputed testimony that the agents knocked at least twice before entering the 1228 Ithaca Drive residence, the Court cannot conclude that the agents failed to sufficiently knock and announce their presence and purpose before entering the residence, or that the agents failed to wait long enough before entering.

And even if the agents *had* violated the knock-and-announce requirement, the Court would nonetheless reject Defendant's argument that all evidence and statements obtained as a result of the unlawful warrantless entry must be suppressed. A failure to comply with the knock-and-announce requirement embodied in the Fourth Amendment does not trigger the exclusionary rule.     See Hudson, 547 U.S. at 599 ("[T]he social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial—incomparably greater than the factors deterring warrantless entries . . . . Resort to the massive remedy of suppressing evidence is unjustified."); United States v. Farias-Gonzalez, 556 F.3d 1181, 1187 (11th Cir. 2009) (discussing rationale for refusing to extend exclusionary rule to knock-and-announce violations); United States v. Neth, No. 6:09-cr-210-Orl-19GJK, 2010 WL 1257695, at *9 (M.D. Fla. Mar. 30, 2010) ("Suppression is not a remedy for a violation of the knock-and-announce rule.") (alteration and quotation omitted). Defendant

does not challenge the conclusion in the R&R to this effect, and the Court finds no error, clear or otherwise, therein.

For these reasons, the Court OVERRULES any objection by Defendant to the conclusion in the R&R that the agents' warrantless entry of the 1228 Ithaca Drive residence on December 16 comported with the Fourth Amendment or, in the alternative, that any constitutional violations do not merit the suppression of evidence or statements obtained as a result of such violations.

c.   The Protective Sweep of the Residence

Finally, Defendant objects to the conclusion in the R&R that the warrantless search of the 1228 Ithaca Drive residence comported with the Fourth Amendment as a "protective sweep." Mainly employing Cotton's testimony at the suppression hearing, Defendant argues that "law enforcement's presence and conduct clearly exceeded any justification provided in a 'protective sweep['] in order to execute an arrest warrant" [Doc. 32 at 28].[26]

---

[26] Defendant also argues that "[a] security sweep and prolonged presence of law enforcement in the residence [were] also unlawful because [Defendant] was right at the door and immediately taken into custody" when the agents entered the residence [Doc. 32 at 30]. His objection to the protective sweep on this ground lacks merit. As Magistrate Judge Vineyard concluded in the R&R, "a protective sweep of a house can be lawful [even] where the arrest occurs outside the house." United States v. Flores, No. 2:08-cr-108-FtM-29SPC, 2009 WL 55022, at *3 (M.D. Fla. Jan. 7, 2009). See also United States v. Watson, 273 F.3d 599, 603 (5th Cir. 2001) ("A protective sweep of a suspect's house may be made even if the arrest is made near the door but outside the lodging if the arresting officers 'have reasonable grounds to believe that there are other persons present inside who might present a security risk.'") (internal quotation omitted). For that reason, the Court

"[A]s an incident to . . . arrest . . . officers [can], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 334 (1990). See also United States v. Legette, 260 F. App'x 247, 249 (11th Cir. 2008) (per curiam) ("[A] protective sweep may be undertaken lawfully pursuant to an in-house arrest where the officer 'possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'") (quoting Buie, 494 U.S. at 337).

Such a precautionary protective sweep must be "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others." Buie, 494 U.S. at 327. The sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. See also Chimel v. California, 395 U.S. 752, 763 (1969) ("There is no . . . justification . . . for searching through all the desk drawers or other closed or concealed areas in [the immediate area where an arrest occurs]. Such searches, in the absence of well-recognized exceptions [to the warrant requirement], may be made only under authority of a search warrant.").

Before the agents approached or entered the 1228 Ithaca Drive residence, Agent Sheppard had seen one individual, Tanner, leave the residence. Agent Sheppard had also received information from

OVERRULES Defendant's objection to the protective sweep on the ground that the sweep took place while Defendant was in custody near the front door of the 1228 Ithaca Drive residence.

Agent Arrugueta about Defendant's past convictions, including one conviction involving a weapon, and a "deal" involving Defendant "to provide machine guns to a special agent," as well as the firearms and other evidence seized after Defendant's May 6 arrest. While the agents knocked on the residence's front door and announced their presence and purpose, Agent Sheppard saw someone peering through the blinds of an upstairs window. And once the agents entered the residence, they heard an individual, other than Defendant, yelling from upstairs. These circumstances gave the agents reason to believe that an individual, or individuals, potentially posing a danger to them or to others might be elsewhere in the residence. This reasonable belief justified the agents then conducting a limited protective sweep of the premises.

Even if the circumstances of Defendant's arrest authorized the agents to conduct a protective sweep of the 1228 Ithaca Drive residence, Defendant argues that the agents exceeded the scope of that authorization by searching areas of the residence where no person possibly posing a danger to the agents or others could feasibly hide and mount a surprise attack. The Court agrees with Magistrate Judge Vineyard that this "argument comes down to an assessment of the testimony presented at the [suppression] hearing" by the agents and Cotton [Doc. 27 at 58].

After conducting the suppression hearing, Magistrate Judge Vineyard concluded that "the credible testimony indicate[d] that the agents limited their search to areas where a person could hide," rather than the areas that Cotton testified to having heard or observed agents searching [Doc. 27 at 58]. Magistrate Judge Vineyard concluded that "Cotton's testimony regarding the search

52

upstairs . . . [did] not refute the credible record evidence that the agents only searched areas where individuals could be located," as Cotton "specifically testified that she *heard* drawers and cabinets being opened[,] but she did not actually observe what the agents were doing while conducting the sweep of the upstairs" [Doc. 27 at 59-60]. And "while Cotton testified that she observed the agents downstairs opening cabinets and items where individuals could not hide, no evidence was seized from these locations" that could be suppressed due to the search [Doc. 27 at 60].

As the Court has noted several times throughout this Order, Magistrate Judge Vineyard gave the agents' testimony regarding the scope of the protective sweep more weight than Cotton's, after hearing both versions of the facts at the suppression hearing. To the extent that Defendant's objections merely take issue with Magistrate Judge Vineyard's credibility determinations, the Court sees nothing in the record to reject the facts found in the R&R regarding the nature, extent, or duration of the protective sweep.

But even if, for the sake of argument, certain actions by the agents exceeded the scope of a protective sweep authorized by Buie and the Fourth Amendment, the Court agrees with Magistrate Judge Vineyard that the agents used no evidence found as a result of their unconstitutional actions to form a basis for the search warrant later issued by Magistrate Judge Brill. Rather, the agents only used evidence lawfully seen in plain view during permissible portions of the protective sweep—namely, the firearms in plain view on the bedroom nightstand, the handgun ammunition in plain view in a clear plastic counter, the pistol holster on the floor of a bedroom closet, the gas bill in plain view on the kitchen

counter, and the baggy in plain view behind the computer desk. No evidence located as a result of unconstitutional overreaching formed the basis of the agents' search warrant application or the actual warrant eventually issued. As a result, no evidence stands to be suppressed due to any acts by the agents that arguably went beyond the protective sweep permitted by Buie. See United States v. Ford, 56 F.3d 265, 270 (D.C. Cir. 1995) (suppressing evidence seized from search under mattress and behind window as beyond scope of permissible protective sweep, but refusing to suppress evidence seized during permissible portions of protective sweep).

For these reasons, the Court agrees with Magistrate Judge Vineyard that the agents who searched the 1228 Ithaca Drive residence on December 16 were authorized to conduct, and did not go beyond the scope of, a permissible protective sweep of the premises to search for potential threats to officer or public safety. And, to the extent any agents exceeded the scope of such a sweep, the Court agrees with Magistrate Judge Vineyard that such acts did not lead to the discovery of any evidence—much less any evidence used to form the basis for the search warrant issued by Magistrate Judge Brill. As such, Defendant's objections to these conclusions in the R&R are OVERRULED.

9. Waiver of *Miranda* Rights During and After Protective Sweep of the 1228 Ithaca Drive Residence

Defendant next objects to Magistrate Judge Vineyard "finding that Defendant was validly advised of his [Miranda] rights after he was arrested and handcuffed [on December 16], and that, even if . . . Agent [Arrugueta] subjected Defendant to a custodial interrogation without first administering [Miranda] rights, [Agent

54

Arrugueta's] questions were justified under the public safety exception to [Miranda]" [Doc. 32 at 31]. Defendant argues that, because any statements made to Agent Arrugueta on December 16 "were made without the valid waiver of his [ Miranda] rights, [while] Defendant was clearly in custody, and after [Defendant] told Agent Arrugueta [that] he did not want to speak to him, the statements were illegally obtained and should be suppressed from the trial of this case" [Doc. 32 at 35].

Upon de novo review, the Court agrees with Magistrate Judge Vineyard that, even if Agent Arrugueta subjected Defendant to a custodial interrogation on December 16 without reading Defendant his Miranda rights or securing a waiver of those rights from Defendant, Agent Arrugueta was permitted to ask the questions that he asked under the public safety exception to Miranda.

In New York v. Quarles, 467 U.S. 649 (1984), "the Supreme Court established a narrow exception to Miranda for situations where there is a threat to public safety." United States v. Newsome, 475 F.3d 1221, 1224 (11th Cir. 2007). "The public safety exception allows officers to question a suspect without first Mirandizing him when necessary to protect either themselves or the general public." Id. (citing Quarles, 467 U.S. at 655-58). "T he Court held that 'the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination.'" Id. at 1225 (quoting Quarles, 467 U.S. at 657). The public safety exception "also applies where there is a threat to the officers rather than the public." Id. (citing Quarles, 467 U.S. at 659). Even where a "gun [may be

located] in a private residence, and therefore pose[] no threat to members of the general public[,] the public safety exception extends to concerns for officer safety," authorizing officers to ask about firearms located in a private home. United States v. Trinidad, No. 3:06-cr-116-J-32HTS, 2006 WL 1281034, at *3 n.4 (M.D. Fla. May 10, 2006) (internal marks and quotation omitted).

In this case, Agent Arrugueta asked Defendant four questions related to items that might have been located in the 1228 Ithaca Drive residence that could pose a danger to the agents conducting the protective sweep or to Cotton and Kelsey, whom the agents knew were located somewhere in the upstairs portion of the house. Agent Arrugueta asked these questions aware that Defendant had a prior conviction for possessing a weapon and that various firearms had been seized by the HCPD following Defendant's May 6 arrest. No evidence adduced at the suppression hearing indicated that Agent Arrugueta asked these questions out of an investigatory motive or in an effort to elicit incriminating responses from Defendant. Rather, Agent Arrugueta strictly tailored his questions to issues implicating the safety of the agents and the others in the residence. As such, Agent Arrugueta was not required to inform Defendant of his Miranda rights, or secure a waiver of those rights from Defendant, in order to ask Defendant the few questions that he asked. For this reason, the Court concludes that the statement made by Defendant in response to those questions need not be suppressed, and the Court OVERRULES Defendant's objection to the conclusion in the R&R to that effect.

### 10. Validity of the Affidavit Supporting the Search Warrant Application

Defendant next objects to Magistrate Judge Vineyard "failing to find that the affidavit in support of the search warrant for the residence [located at 1228 Ithaca Drive] included material misrepresentations and omissions" of fact which, according to Defendant, would render the search warrant deficient under the Fourth Amendment [Doc. 32 at 36].

To support this argument, Defendant takes Cotton's testimony from the suppression hearing regarding the protective sweep as entirely true. According to Defendant, because Agent Arrugueta did not include Cotton's version of the facts in the affidavit supporting the search warrant application, he "knowingly and intentionally made a material misrepresentation and omission [of fact] by failing to inform [Magistrate Judge Brill] about" the actual facts of the sweep [Doc. 32 at 37]. Defendant also argues that Agent Arrugueta failed to disclose in the affidavit that Defendant did not waive his Miranda rights or agree to speak to the agents while in custody at the 1228 Ithaca Drive residence on December 16 [Doc. 32 at 37].

"There is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant." Franks v. Delaware, 438 U.S. 154, 171 (1978). "To attack the veracity of a warrant affidavit, a defendant must make a preliminary showing that the affiant made intentional misstatements or omissions (or made misstatements with a reckless disregard for their truthfulness) that were essential to the finding of probable cause." United States v. Burston, 159 F.3d 1328, 1333 (11th Cir. 1998) (citations

omitted). "Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant." Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997) (citations omitted). If Defendant prevails on his challenge, however, "the search warrant is to be voided and the fruits of the search must be excluded." Burston, 159 F.3d at 1333-34 (citing Franks, 438 U.S. at 155-56).

Defendant's second objection—that the search warrant must be voided because Agent Arrugueta failed to disclose in the affidavit that Defendant did not waive his Miranda rights or agree to speak to the agents at the 1228 Ithaca Drive residence—raises an immaterial challenge, even when taken as true, to the affidavit's validity. Agent Arrugueta lawfully asked Defendant, in the interest of public safety, whether there were any firearms in the house. Under these circumstances, nothing obligated Agent Arrugueta to clarify in the affidavit that Defendant never waived his Miranda rights or agreed to speak to the agents, as Agent Arrugueta asked Defendant questions, and Defendant responded, in a manner that did not necessitate a waiver of Defendant's Miranda rights. Moreover, Defendant has made no substantial showing, in his objections to the R&R or elsewhere, that this particular fact, even if taken as material to the issue of probable cause, was omitted out of a deliberate or reckless disregard for the truth by Agent Arrugueta, rather than as a result of mere negligence on his part or due to an innocent mistake.

Defendant's other objection—that the search warrant must be voided because Agent Arrugueta failed to disclose the version of the facts of the December 16 protective sweep testified to by

Cotton—also fails. Even if such a misstatement or omission might call into question the probable cause found by Magistrate Judge Brill in issuing the search warrant, Defendant has not made a substantial showing that Agent Arrugueta actually intentionally or recklessly omitted or misstated any facts in the affidavit. The Fourth Amendment does not require "that every fact recited in [a] warrant affidavit [be] necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." Franks, 438 U.S. at 165. The Fourth Amendment requires only that information relayed in a warrant application's supporting affidavit "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." Id.

No evidence adduced at the suppression hearing indicated that Agent Arrugueta had any reason to believe, or in fact believed, at the time that he swore to the facts in the supporting affidavit, that the facts regarding the protective sweep relayed therein were false. Simply because Cotton provided contradictory testimony at the suppression hearing about the facts of the sweep, as she perceived them, does not mean that Agent Arrugueta intentionally or recklessly misstated or omitted certain facts, as he perceived them, following the sweep, or that Agent Arrugueta had any reason to believe that the facts, as he perceived them, were false. The Fourth Amendment does not demand of search warrant affiants the high standard of factual accuracy that Defendant urges.

For these reasons, the Court OVERRULES Defendant's objections to the conclusion in the R&R that Agent Arrugueta's supporting

affidavit did not include material misrepresentations or omissions of fact that must vitiate the search warrant issued for the 1228 Ithaca Drive residence by Magistrate Judge Brill.

III. Conclusion

The Court has carefully considered the parties' submissions and has reviewed de novo those portions of the R&R to which Defendant timely and specifically objected, consistent with 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b).

For the foregoing reasons, Defendant's objections to the R&R [Doc. 32] are OVERRULED. The R&R [Doc. 27] is ADOPTED in full. As a result, Defendant's motions to suppress evidence and statements [Docs. 12 & 14] are DENIED.

SO ORDERED this 11 day of August, 2010.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

60